## TOOISGAH v. UNITED STATES.

### No. 4104.

United States Court of Appeals Tenth Circuit.

Dec. 5, 1950.

Phillips, Chief Judge, dissented.

94

Grady Lewis, Washington, D. C., for appellant.

Robert E. Shelton, U. S. Atty., Oklahoma City, Okl., for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The petitioner, Phillip Tooisgah, a full-blood Apache Indian, was indicted, tried and convicted in the Western District of Oklahoma, for the murder of Lucy Tah-dooahnippah, a full-blood Comanche Indian. Federal jurisdiction over the offense is based upon the allegation in the indictment to the effect that the homicide occurred on June 2, 1942, in Caddo County, and in the Western District of Oklahoma, in Indian Country upon a reservation and a tract of land within the exclusive jurisdiction of the United States, comprising the Indian allotment of Ellen Mulkehay, patent deed never having been issued to her by the Secretary of the Interior.

When the case was here on appeal, Tooisgah v. United States, 10 Cir., 137 F.2d 713, jurisdiction of the court over the offense was not challenged. We noticed and sustained it, however, under R. S. § 2145, 25 U.S.C.A. § 217; and Section 328 of the Criminal Code, 35 Stat. 1151, 18 U. S.C.A. § 548, Section 9 of the Act of March 3, 1885, 23 Stat. 362, 385, on a stipulation in the record to the effect that the allotment described in the indictment was the Ellen Mulkehay allotment, and that it was trust property to which the United States held legal title for the Indian allottee, citing United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676; United ed States v. Ramsey, 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039; Ex parte Nowabbi, 60 Okl.Cr. 111, 61 P.2d 1139; and Ex parte Pero, 7 Cir., 99 F.2d 28.

By this motion to vacate under Section 2255, Title 28, United States Code Annotated, we are asked to re-examine the jurisdiction of the court, it being earnestly contended that the agreed facts do not bring the offense charged within the provisions of either of the jurisdictional acts relied upon, as construed by the authorities cited as controlling.

Section 2255, in material part, provides that a "prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that * * * the court was without jurisdiction to impose such sentence * * * may move the court which imposed the sentence to vacate, set aside or correct the sentence * * * at any time * * *. If the court finds that the judgment was rendered without jurisdiction * * * the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."

The jurisdiction of the court and of the United States over the offense charged was squarely put in issue on agreed facts, and was sustained as a matter of law in the trial of the case, the court holding that the "defendant had been convicted of murder of a full-blood Comanche Indian upon an Indian reservation." And, while res judicata has not been invoked, nor is it strictly applicable in cases of this kind, Section 2255 affords adequate protection against repetitious motions by expressly providing that the "sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." We have construed this clause as empowering the court to dispose of a "second or successive" motion in the exercise of a sound judicial discretion, "guided and controlled by a consideration of whatever has a rational bearing on the propriety of the relief sought," thus likening successive motions under Section 2255 to successive applications for writs of habeas corpus. See Barrett v. Hunter, 10 Cir., 180 F.2d 510; and see 28 U.S.C.A. § 2244.

■ Since this is the first motion under Section 2255, cf. Gebhart v. Hunter, 10 Cir., 184 F.2d 644, it may be seriously doubted whether we have unqualified discretion to refuse to entertain it as "a second or successive motion for similar relief." But even so, discretion to entertain the motion, going as it does to the jurisdiction of the court over the offense, based upon agreed facts, seems to us manifestly clear.

■ Unlike Hatten v. Hudspeth, 10 Cir., 99 F.2d 501, and Davis v. Johnston, 9 Cir., 144 F.2d 862, no new or additional facts are sought to be injected into the case, and

no adjudicated facts are sought to be impeached. The question is one of law whether the agreed and adjudicated facts bring the offense within that class over which exclusive federal jurisdiction is extended by statute. Since the motion goes squarely to the jurisdiction of the court on agreed facts; involves human liberties, as well as a possible conflict between state and federal jurisdiction over crimes committed within the boundaries of a sovereign state; and since the question of jurisdiction was not presented or painstakingly considered in the direct appeal, we deem it appropriate to re-examine it here. Cf. Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442, 83 L.Ed. 455.

Under R.S § 2145, 25 U.S.C.A. § 217, the general laws of the United States as to the punishment of crimes committed any place within the sole and exclusive jurisdiction of the United States was extended to "Indian Country." But the following Section 2146, 25 U.S.C.A. § 218, expressly provides in material part that Section 2145 should not extend to crimes by one Indian against the person or property of another Indian.

When R. S. 2145 was originally enacted as Section 25 of the Act of June 30, 1834, 4 Stat. 733, it was and had been the uniform policy of the United States to recognize the Indians in Indian Country as a separate people, with power to regulate their internal and social relations, and thus to leave to the tribal government jurisdiction over crimes and offenses committed by one Indian against the person or property of another Indian in Indian Country. United States v. Joseph, 94 U.S. 614, 617, 24 L.Ed. 295; Ex parte Crow Dog, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030; United States v. Kagama, 118 U.S. 375, 381, 6 S.Ct. 1109, 30 L.Ed. 228; United States v. Quiver, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196; Cohen Handbook on Federal Indian Law, Ch. 7, p. 122.

It was not until after the decision in Ex parte Crow Dog, supra, in 1883, that Congress, by Section 9 of the Act of March 3, 1885, 23 Stat. 362, 385, extended federal law and federal jurisdiction over certain enumerated crimes, including murder, when committed by one Indian against the person or property of another Indian, within any territory of the United States, either within or without an Indian reservation, and "within the limits of any Indian reservation" lying wholly within the boundaries of a state. This Section was reenacted as Section 328 of the Criminal Code, 35 Stat. 1151, and has become commonly known as the Ten Major Crimes Act. The phrase "within the limits of any Indian reservation" was subsequently amended to read "on and within any Indian reservation under the jurisdiction of the United States Government". Act of June 28, 1932, 47 Stat. 336, and the Act became known as Section 548 of the United States Code Annotated. The effect of this law as originally enacted, was to repeal "in part the limitation that was imposed by § 2146 upon the effect of § 2145." Donnelly v. United States, 228 U.S. 243, 270, 33 S.Ct. 449, 450, 57 L.Ed. 820; see also United States v. Kagama, supra.

But Section 2146 was not repealed by Section 328, except to the extent necessary to confer federal jurisdiction over certain enumerated crimes when committed by one Indian against another Indian in carefully specified places. Indeed, Section 2146 remained unchanged when it was recodified with Section 2145 as Section 1152 of the Revised Criminal Code, 18 U. S.C.A. It is therefore clear that the offense charged here is not cognizable in the Federal court under Section 2145 (now 1152), and the only question for decision is whether the asserted federal jurisdiction over the offense is sustainable under 328 as an offense of murder of one Indian by another "on and within any Indian reservation under the jurisdiction of the United States Government."

In the resolution of that question, it is important to keep in mind that when in 1907, the Territory of Oklahoma was admitted into the Union upon an equal footing with the original states, it thereby acquired full and complete jurisdiction over all persons and things within its boundaries, including the Indians, except to the extent that the federal government expressly retained or asserted paramount jurisdiction

over them as guardian and ward. See United States v. McBratney, 104 U.S. 621, 26 L.Ed. 869; Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419.

Thus, for purposes of our case, it may be said that the United States retained jurisdiction under Section 2145 for offenses committed by a non-Indian against an Indian, or an Indian against a non-Indian, in "Indian Country," and over certain enumerated crimes, when committed by one Indian against another Indian "within the limits of any Indian reservation lying within the boundaries of a state." See Donnelly v. United States, supra; United States v. Pelican, supra; United States v. Ramsey, supra; Ex parte Nowabbi, supra; Ex parte Wallace, Okl.Cr.App., 162 P.2d 205.

Undoubtedly, the alleged crime was committed on lands originally "on and within any Indian reservation", set apart and established by the Medicine Lodge Treaty of 1867 between the United States and the Kiowa, Comanche and Apache Indians, 15 Stat. 581, 589. See Lone Wolf v. Hitchcock, 187 U.S. 553, 554, 23 S.Ct. 216, 47 L. Ed. 299.

Subsequently, by agreement dated October 6, 1892, approved June 6, 1900, 31 Stat. 676, the Kiowa, Comanche and Apache Indians occupying the reservation agreed with the United States that subject to the allotment of land in severalty to the individual members of the tribes; the setting aside of 480,000 acres of grazing lands, and other considerations, the tribes ceded, conveyed, transferred, relinquished and surrendered forever and absolutely all their claim, title and interest of every kind and character in and to the lands embraced in the reservation. Out of the lands thus ceded, and in part consideration thereof, it was agreed that each member of the respective tribes should have the right to an allotment of 160 acres of land, to be held and owned in severalty. The agreement also provided that when the allotments of land had become selected and approved by the Secretary of the Interior, the titles thereto should be held in trust for the allottees respectively for a period of 25 years in the time and manner and to the extent provided for in the General Allotment Act of February 8, 1887, 24 Stat. 388.

Section 6 of the General Allotment Act, as amended by the Act of May 8, 1906, 34 Stat. 182, provided that at the expiration of the trust period, and when the lands had been conveyed to the Indian allottees in fee, every allottee "shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside", provided that "until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States: And provided further, That the provisions of this Act shall not extend to any Indians in the Indian Territory." See Ex parte Nowabbi, supra. It is not alleged that either Indian involved here occupied the status of an allottee of lands, the title to which is held in trust by the United States, and federal jurisdiction is not invoked or sought to be sustained under the provisions of this Act.

The allotment of lands in severalty within the limits of the established reservation did not for that reason disestablish the reservation of which they were a part, or exclude the allotments from it. United States v. Kiya, D.C., 126 F. 879. Once the reservation is established "all tracts included within it remain a part of the reservation until separated therefrom by Congress." United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195; Cf. Kills Plenty v. United States, 8 Cir., 133 F.2d 292; United States v. Frank Black Spotted Horse, D.C., 282 F. 349; Hatten v. Hudspeth, 10 Cir., 99 F.2d 501.

When, however, the tribes occupying the reservation ceded the lands embraced within it to the United States, relinquishing and surrendering "all their claim, title and interest," subject to the allotments in severalty, and every allottee was given the benefit of and made subject to the laws, both criminal and civil, of the state or territory, with the gift of citizenship and equal protection of the laws, Section 6 of the Act of February 8, 1887, 24 Stat. 388, we think it cannot be doubted that Congress thereby intended to dissolve the tribal government,

disestablish the organized reservation, and assimilate the Indian tribes as citizens of the state or territory. United States v. LaPlant, D.C., 200 F. 92.

The inquiry then is whether these several allotments, into which the reservation was divided, nevertheless remained "within any reservation," or in some manner became separate reservations for purposes of federal jurisdiction under Section 328.

Trust allotments reserved or excepted from a portion of an Indian reservation restored to the public domain was held to retain its character as "Indian Country" under Section 2145, in United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 399, 58 L.Ed. 676. The court took the view that the lands remained Indian lands, set apart for Indians under governmental care, and remained "Indian country through the distribution into separate holdings, the government retaining control", even though the allotments were scattered through territory, other portions of which were open to white settlement. See also Ex parte VanMoore, D.C., 221 F. 954.

On the authority of the Pelican case, jurisdiction under Section 2145 was sustained over the offense of murder committed against an Osage Indian on lands allotted to an Indian out of the Osage Reservation, title to which was restricted against alienation. United States v. Ramsey, 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039. In holding that the allotment was "Indian Country" within the meaning of the jurisdictional statute, the court could discern no difference in the Indian character of an allotment, the title to which remained in the Government in trust for the Indian, and an allotment, the title to which was in the Indian, subject to restrictions against alienation.

Legislation prohibiting the sale of liquor to Indian wards of the Government, or its introduction or attempted introduction into Indian Country, defined the term "Indian Country" to include any Indian allotment, while the title to same shall be held in trust by the government, or while it shall remain inalienable by the allottee without the con-sent of the United States. See Act of January 30, 1897, 29 Stat. 506, R.S. § 2139, p. 373, as amended June 15, 1938, 52 Stat. 696, 25 U.S.C. 241.[1] Under the Revised Code, effective September 1, 1948, as amended May 24, 1949, 63 Stat. 94, Indian Country was comprehensively defined as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent * * * (b) all dependent Indian communities within the borders of the United States * * * (c) all Indian allotments, the Indian titles to which have not been extinguished * * *" 18 U.S.C.A. § 1151. See Reviser's Notes to Section 1151, R.S.

In seeking a satisfactory definition for "Indian Country", under Section 2145, and "within * * * any Indian reservation" under Section 548, the courts have not infrequently drawn upon the decisional definition of one to give meaning to the other in the same context. Yohyowan v. Luce, D.C., 291 F. 425. Some courts have used the terms synonymously. State v. Johnson, 212 Wis. 301, 249 N.W. 284; Ex parte Tilden, D.C., 218 F. 920. Still other courts have said authoritatively that " 'Indian Country' was a reservation, yet a reservation is not necessarily 'Indian Country' ". United States v. Celestine, supra.

Appellant urges a decisive distinction between allotted lands excepted or reserved from a reservation restored to the public domain as in the Pelican case, or a restricted allotment in the Osage Reservation as in the Ramsey case, and an allotment from lands, the Indian title to which had been extinguished before or subject to allotment. See definition of Indian Country in Bates v. Clark, 95 U.S. 204, 24 L.Ed. 471. It is argued, with reason, that with the extinguishment of the Indian title to all of the lands in the reservation, it no longer retained its Indian character, and therefore ceased to be Indian Country within the meaning of Section 2145 (Section 217), and certainly not a reservation within the purview of Section 548. And see United States v. Oklahoma Gas & Electric Co., 318 U.S.

---

1. See Reviser's Notes, 1948 Revised Criminal Code, 18 U.S.C.A. §§ 1154, 1156.

206, 217, 63 S.Ct. 534, 87 L.Ed. 716; United States v. Myers, 8 Cir., 206 F. 387.

■ We find it unnecessary to decide whether the trust allotments in question might have been construed as "Indian Country" under 217 or 548 when the offense was committed, since we are convinced that Congress did not intend to use the terms "Indian Country" and "within the limits of any * * * reservation" synonymously when it came to relax the limitations imposed upon 217 by 218. When the legislative scheme is considered in its historical setting, we think it of controlling significance that instead of employing the familiar term "Indian Country", with its broad and flexible definition to delineate federal jurisdiction, Congress chose language carefully designed to recognize the sovereign jurisdiction of a state, unless the offense was committed on a place set apart for the government of the Indians as a tribe. The deliberate choice of the phrase "within any Indian reservation under the jurisdiction of the United States Government" indicates, we think, a Congressional disposition to restrict federal jurisdiction to organized reservations lying within a state.

In the reenactment of 548 as Section 1153, Title 18 U.S.C.A., Congress substituted "Indian Country" for "on [or] within any Indian reservation", thus conferring federal jurisdiction over the enumerated crimes when committed in Indian Country, as defined in Section 1151 of the Revised Criminal Code.

■ But, judging federal jurisdiction here under the words of the statute when the offense was committed, we are now constrained to hold that when the reservation was dissolved and tribal government broken up, the allotted lands lost their character as lands "within any Indian reservation". Nor did they retain or acquire a character and identity peculiar to a separate Indian reservation. We therefore hold that the court lacked jurisdiction over the offense. The order is accordingly reversed and the cause remanded with directions to vacate the judgment and dismiss the indictment.

PHILLIPS, Chief Judge (dissenting).

This is a motion to vacate a sentence filed under 28 U.S.C.A. § 2255.

The indictment charged Tooisgah, hereinafter called the defendant, with the offense of murder in the first degree, and alleged that such offense was committed "in the Western District of Oklahoma and within the jurisdiction of this Court and in the Indian Country and in and upon a reservation thereof, as established by the law of the United States, and on a certain tract of land which was then and there under the sole and exclusive jurisdiction of the United States and comprised of an Indian allotment of Ellen Mulkehay, the title to said allotment on the 2nd day of June, 1942, being held in trust by the United States and was inalienable by the said Ellen Mulkehay, and for which said allotment said Ellen Mulkehay had never had issued to her by the Secretary of the Interior Department of the United States a certificate of title and the Government of the United States having sole and exclusive control over said lands, * * *." The indictment further alleged that the defendant was a full-blood Apache Indian and that the person murdered was a full-blood Comanche Indian. Counsel for the defendant at the trial on the indictment expressly stipulated that all of such allegations of the indictment were true.

By motion to quash and at the trial on the indictment, the defendant challenged the jurisdiction of the court over the offense charged. The sentencing court adjudged that the defendant had "been convicted on verdict of guilty of the offense charged in the indictment * * * to wit murder of a full-blood Comanche Indian upon an Indian Reservation." Thus, it will be seen that the sentencing court adjudged that it had jurisdiction of the offense charged. That adjudication involved the determination of questions of fact and questions of law. On appeal, this court considered the question of the sentencing court's jurisdiction over the offense and decided and adjudged that the trial court had jurisdiction of the offense.

The defendant by his motion to vacate asked the sentencing court to determine again that precise issue of jurisdiction and, on an appeal from an order denying his motion, now asks this court to determine again that precise issue of jurisdiction which was adjudged by the sentencing court in the trial of the criminal charge and by this court on an appeal from the judgment of conviction. In his motion to vacate, the defendant alleges no new fact not presented in the trial of the criminal case. Neither does he allege that the facts as reflected in the record of that trial are in anywise erroneous.

Section 2255 does not provide an alternate remedy for an appeal. It does not open the door to a defendant to relitigate, first in the sentencing court and then on appeal in this court, matters which must be raised directly in the original trial of the criminal case and on appeal from the conviction therein. A motion under Section 2255 may be predicated only on grounds that may be raised in a collateral attack on a judgment. We so held in Barrett v. Hunter, 10 Cir., 180 F.2d 510, 513; Pulliam v. United States, 10 Cir., 178 F.2d 777, 778, and Gould v. United States, 10 Cir., 173 F.2d 30, 31, following like decisions in the Fourth Circuit. See Howell v. United States, 4 Cir., 172 F.2d 213, 215, and cases there cited; United States v. Gallagher, 3 Cir., 183 F.2d 342, 344; Hastings v. United States, 9 Cir., 184 F.2d 939.

The record on its face does not show affirmatively that the sentencing court was without jurisdiction over the offense. On the contrary, the indictment clearly and sufficiently charged an offense within the jurisdiction of the sentencing court under the provisions of the Act of March 3, 1885, as amended by the Act of January 15, 1897, the Act of March 4, 1909, and the Act of June 28, 1932, 23 Stat. 362, 385; 29 Stat. 487; 35 Stat. 1151; 47 Stat. 336, 337. And, there can be no question but that the sentencing court acquired jurisdiction over the person of the defendant. The sentencing court, therefore, had jurisdiction to determine and adjudicate the question of whether it had jurisdiction of the offense.

See Louie v. United States, 254 U.S. 548, 41 S.Ct. 188, 189, 65 L.Ed. 399, and Bowen v. Johnston, 306 U.S. 19, 25, 26, 59 S.Ct. 442, 83 L.Ed. 455. In the Louie case, the court said:

"The motions made by defendant in the District Court raised a question, not of the jurisdiction of that court, but of the jurisdiction of the United States. The contention was, in essence, that, by reason of the facts set forth in the motions, the defendant was in respect to the acts complained of subject to the laws of the state of Idaho and not to the laws of the United States; In other words that he did not violate the laws of the United States. Compare United States v. Kiya, D.C., 126 F. 879, 880. Section 328 of the Penal Code provides that an Indian committing murder on another Indian 'within the boundaries of any state [of the United States], and within the limits of any Indian reservation, shall be subject * * * to the same penalties as are all other persons committing' the same crime 'within the exclusive jurisdiction of the United States.' United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228; Donnelly v. United States, 228 U.S. 243, 269, 270, 33 S.Ct. 449, 57 L.Ed. 820. The defendant, in effect, denied that the killing was, in the statutory sense, within the reservation. If this was true, an essential element of the crime against the United States was lacking; as much so as if it had been established in United States v. Sutton, 215 U.S. 291, 30 S.Ct. 116, 54 L.Ed. 200, or in United States v. Soldana, 246 U.S. 530, 38 S.Ct. 357, 62 L.Ed. 870, that the region into which liquor was introduced was not Indian country. That the District Court for Idaho had jurisdiction to determine whether the *locus in quo* was a part of the reservation was not questioned. By Section 78 of the Judicial Code the whole state of Idaho is comprised within the District of Idaho; by paragraph second of section 24 District Courts have original jurisdiction of all crimes and offenses cognizable under the authority of the United States; and the defendant was arrested within the district of Idaho.

"Since defendant's motions in the District Court did not raise a question properly

of the jurisdiction of the court, but went to the merits, there was no basis for a direct writ of error from this court. Pronovost v. United States, 232 U.S. 487, 34 S.Ct. 391, 58 L.Ed. 696; Lamar v. United States, 240 U.S. 60, 65, 36 S.Ct. 255, 60 L.Ed. 526. He properly sought review in the Circuit Court of Appeals."

The question of jurisdiction over the offense raised questions of fact and questions of law involving the construction of R.S. § 2145, 25 U.S.C.A. § 217, R.S. § 2146, 25 U.S.C.A. § 218, and the Act of March 3, 1885, as amended, supra. Where a court has jurisdiction to hear and determine the question, its judgment, right or wrong, is impregnable to collateral attack. The test of jurisdiction in such a case is whether the tribunal has power to enter upon the inquiry, and not whether its conclusion in the course of it is right or wrong.[1]

In Burgess v. Nail, 10 Cir., 103 F.2d 37, 43, we said: "Error in the determination of questions of law or fact upon which the court's jurisdiction in the particular case depends, the court having general jurisdiction of the cause and the person, is error in the exercise of jurisdiction. Such an error affords no ground for collateral attack."

In Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 319, 320, 84 L.Ed. 329, the court said:

"The lower federal courts are all courts of limited jurisdiction, that is, with only the jurisdiction which Congress has prescribed. But none the less they are courts with authority, when parties are brought before them in accordance with the requirements of due process, to determine whether or not they have jurisdiction to entertain the cause and for this purpose to construe and apply the statute under which they are asked to act. Their determinations of such questions, while open to direct review, may not be assailed collaterally. * * *.

"The court has the authority to pass upon its own jurisdiction and its decree sustaining jurisdiction against attack, while open to direct review, is res judicata in a collateral action."[2]

And, again, in American Surety Co. v. Baldwin, 287 U.S. 156, 166, 53 S.Ct. 98, 101, 77 L.Ed. 231, the court said: "The principles of res judicata apply to questions of jurisdiction as well as to other issues."[3]

The precise question here presented came before the Ninth Circuit in Davis v. Johnston, 144 F.2d 862. There, the indictment charged the offense of murder and alleged that it was committed within an Indian reservation and a collateral attack was made on the judgment of conviction on such indictment on the ground that the murder was committed upon land which had been allotted and patented to an Indian in severalty and thereafter sold to a white citizen, and was, therefore, no longer within the reservation. The court, in denying relief, said: "The uniform rule is that where the jurisdiction of the court is in issue in the trial court and is dependent upon facts alleged, the finding of jurisdiction is conclusive on the parties in a collateral attack on the judgment on habeas corpus proceedings or otherwise."

The same question was before this court in Hatten v. Hudspeth, 10 Cir., 99 F.2d

1. Foltz v. St. Louis & S. F. Ry. Co., 8 Cir., 60 F. 316, 318, 319; Burgess v. Nail, 10 Cir., 103 F.2d 37, 44; Walling v. Miller, 8 Cir., 138 F.2d 629, 632; National Park Bank v. McKibben & Co., D.C.Ga., 43 F.2d 254, 255; Ripperger v. A. C. Allyn & Co., 2 Cir., 113 F.2d 332, 333; Bretsky v. Lehigh Valley R. R. Co., 2 Cir., 156 F.2d 594, 596; Nye v. United States, 4 Cir., 137 F.2d 73, 77; O. F. Nelson & Co. v. United States, 9 Cir., 169 F.2d 833, 836; Bostwick v. Baldwin Drainage Dist., 5 Cir., 133 F.2d 1, 4.

2. See, also, Stoll v. Gottlieb, 305 U.S. 165, 171, 172, 59 S.Ct. 134, 137, 83 L. Ed. 104; Chicago R. I. & P. Ry. Co. v. Schendel, 270 U.S. 611, 617, 46 S.Ct. 420, 70 L.Ed. 757; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 403, 60 S.Ct. 907, 84 L.Ed. 1263; Bretsky v. Lehigh Valley R. R. Co., 2 Cir., 156 F. 2d 594, 596; National Park Bank v. Mc-Kibben & Co., D.C.Ga., 43 F.2d 254, 255.

3. See, also, Ripperger v. A. C. Allyn & Co., 2 Cir., 113 F.2d 332, 333; Walling v. Miller, 8 Cir., 138 F.2d 629, 632.

501. The indictment there charged that the offense was committed within the limits of an Indian reservation. The sentencing court held it had jurisdiction of the offense. Upon an application for a writ of habeas corpus this court held that such adjudication was res judicata and the issue of jurisdiction of the sentencing court in that case could not be raised on collateral attack.

Moreover this court has held that when an issue has been adjudicated by a judgment in the criminal proceeding and on appeal from that judgment, that precise issue, under the doctrine of res judicata may not be relitigated thereafter on a motion to vacate a sentence filed under § 2255 or on an application for habeas corpus.[4]

While strictly speaking a motion to vacate a sentence is in form a direct attack on the judgment, in substance it is a collateral attack, because it may be predicated only on grounds which may be urged against a judgment challenged on collateral attack.

Since the sentencing court had jurisdiction over the person of the defendant, since want of jurisdiction over the offense not only does not affirmatively appear on the face of the record, but on the contrary the indictment alleges facts which would give such court jurisdiction of the offense under the Act of March 3, 1885, as amended, and the defendant by his counsel expressly stipulated at the criminal trial that such facts were true, and since the sentencing court had jurisdiction to determine whether it had jurisdiction of the offense, and expressly adjudged that the defendant had been convicted of the offense of murder of a full-blood Comanche Indian upon an Indian reservation and that it had jurisdiction over such offense, it is my conclusion that it could not be urged as a ground for collateral attack on the judgment that the sentencing court did not have jurisdiction of the offense and, therefore, such asserted want of jurisdiction affords no ground for

a motion to vacate the judgment, filed under § 2255.

But, if the issue of jurisdiction could be re-examined in this proceeding, it is my opinion that we cannot say on the record before us that the court lacked jurisdiction over the offense charged in the indictment.

The majority states that the Mulkehay allotment was within the area set apart and established as an Indian reservation for the Kiowa, Comanche, and Apache Indians by the Medicine Lodge Treaty of 1867, 15 Stat. 581, 582, 589. That, perhaps, may be assumed or inferred from a fact, apparently stipulated, that Mulkehay was an Apache allottee.

An Indian reservation is not a territorial unit of government, where Indian laws and Indian customs prevail. Neither does a reservation measure the territory over which an Indian court may exercise its jurisdiction. A reservation is simply a part of the public domain, set apart by proper authority for use and occupancy for general or limited purposes by Indians. Such a reservation may be created without formal cession or formal act. In State of Minnesota v. Hitchcock, 185 U.S. 373, 389, 390, 228 S.Ct. 650, 657, 46 L.Ed. 954, the court said:

"Now, in order to create a reservation, it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes. Here the Indian occupation was confined by the treaty to a certain specified tract. That became, in effect, an Indian reservation. Spalding v. Chandler, 160 U.S. 394, 16 S.Ct. 360, 40 L.Ed. 469, is in point. There, as here, was presented the question of the origin of a reservation, and in respect thereto it was said (160 U.S. at pages 403, 404, 16 S.Ct. at page 364, 40 L.Ed. 469):

" 'It is not necessary to determine how the reservation of the particular tract, subsequently known as the "Indian reserve,"

---

4. Gebhart v. Hunter, 10 Cir., 184 F.2d 644, and cases there cited; Holbrook v. Hunter, 10 Cir., 149 F.2d 230, 231; Fowler v. Hunter, 10 Cir., 164 F.2d 668, 669; Garrison v. Hunter, 10 Cir., 149 F.2d 844, 845.

came to be made. It is clearly inferable from the evidence contained in the record that at the time of the making of the treaty of June 16, 1820, the Chippewa tribe of Indians were in the actual occupation and use of this Indian reserve as an encampment for the pursuit of fishing. * * * But whether the Indians simply continued to encamp where they had been accustomed to prior to making the treaty of 1820, whether a selection of the tract, afterwards known as the Indian reserve, was made by the Indians subsequent to the making of the treaty and acquiesced in by the United States government, or whether the selection was made by the government and acquiesced in by the Indians, is immaterial. * * * If the reservation was free from objection by the government, it was as effectual as though the particular tract to be used was specifically designated by boundaries in the treaty itself. The reservation thus created stood precisely in the same category as other Indian reservations, whether established for general or limited uses, * * *.' "

The agreement of October 21, 1892, approved June 6, 1900, 31 Stat. 676-681, in my opinion, only in part disestablished the reservation created by the Medicine Lodge Treaty of 1867. It is true that such agreement ceded and relinquished to the United States the lands described in the Medicine Lodge Treaty, but that cession and relinquishment was expressly subject to the allotment in severalty, to each adult and minor member of the Comanche, Kiowa, and Apache tribes, of 160 acres of land out of the land ceded and relinquished, to be held in trust for the allottees, respectively, for the period of 25 years; and that cession and relinquishment was further expressly subject to the setting aside for the "use in common" by "said Indian tribes" of 480,000 acres of grazing land out of the land ceded and relinquished.

There was no interruption in the right of the Indians to occupy such lands on the reservation, because the agreement expressly gave to each Indian the right to select as his allotment lands upon which he had made improvements and then used and occupied, and it provided that after the allotments had been made, the remaining lands should be opened to entry.

The agreement of October 21, 1892, did not discontinue tribal relations and it is clear that it did not contemplate that tribal relations of the three tribes would be discontinued, because it provided, not that the 480,000 acres of grazing land should be used in common by the members of the three tribes, but that such lands should be "set aside for the use in common for said Indian tribes."

In United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 398, 58 L.Ed. 676, the defendants were charged by indictment with the offense of murder on a tract of land, which had been allotted to an Indian, Agnes. The indictment was based on R.S. § 2145. The allotment was embraced in the Colville Indian Reservation, and by virtue of that fact alone, became Indian country. The reservation was created by executive order on July 2, 1872. By the Act of July 1, 1892, 27 Stat. 62, a specified tract embraced in the reservation, with certain exceptions, was vacated and restored to the public domain, and it was provided that such tract should be open to settlement and entry by the proclamation of the President. In order to provide for the Indians residing on such tract, Congress made the exceptions referred to by providing that every such Indian should be entitled to select from such tract 80 acres, to be allotted to him in severalty, and that the title to the allotted lands should be held in trust for the benefit of the allottees, respectively, and afterwards conveyed in fee simple to the allottees or their heirs. One of the 80-acre tracts selected under such provision was the allotment to Agnes. The court in dealing with the execptions referred to, said: "The evident purpose of Congress was to carve out of the portion of the reservation restored to the public domain the lands to be allotted and reserved, as stated, and to make the restoration effective only as to the residue. The vacation and restoration which the statute accomplished (§ 1) was thus expressly made 'subject to the reservation and allotment of lands in severalty to the individual members of the Indians

of the Colville Reservation' for which the act provided."

Likewise, it seems to me in the instant case, that by the agreement of October 21, 1892, which provided that "subject to the allotment of lands, in severalty to the individual members of the Comanche, Kiowa and Apache tribes of Indians, * * * and subject to the setting apart" * * * "for the use in common for said Indian tribes four hundred and eighty thousand acres of grazing lands * * *," the lands embraced in the reservation created by the Medicine Lodge Treaty were ceded and relinquished to the United States, and that such lands should thereafter be restored to the public domain, Congress intended to carve out and except from the cession to the United States and restoration to the public domain, the lands to be allotted and the grazing lands to be designated and to make the cession and restoration effective only as to the residue.

Furthermore, in the Pelican case, the Supreme Court held, notwithstanding the allotment upon which the offense was committed became Indian country solely by virtue of its inclusion in the Colville Reservation and prior to the alleged date of the commission of the offense had been allotted under the Act of July 1, 1892, to an Indian, Agnes, that because such land was held in trust by the United States for the sole use and benefit of the allottee and his heirs for a period of 25 years, and because such lands and the allottee[5] continued to be under the jurisdiction and control of Congress for all governmental purposes relating to the guardianship and protection of the Indians, and because such lands

were devoted to Indian occupancy under the limitations imposed by the Act of July 1, 1892, such lands retained their Indian character and remained Indian country. And the Court concluded that there was no doubt of the intent of Congress to maintain Federal jurisdiction over the lands allotted to the Indian, Agnes, and sustained the jurisdiction of the Federal court over the offense.[6]

The 480,000 acres set aside as grazing lands to be used in common by the three tribes clearly continued to be an Indian reservation; the allotted lands were lands set apart for the exclusive use and occupancy of Indians; the title to the allotted lands was held by the United States in trust for the benefit of the Indian allottees; and the United States retained exclusive jurisdiction over such lands and the allottees during the continuance of the trust period. It, therefore, seems to me that instead of the agreement of 1892 disestablishing and extinguishing the reservation, it merely reduced the area thereof, so that thereafter it embraced only the allotted lands and the 480,000 acres of grazing lands.

Lands which form a part of an Indian reservation are not excluded from the reservation, by reason of their allotment in severalty, under trust patents which retain the legal title in the United States in trust for the allottee and impose conditions on alienation, and notwithstanding the allotment of such lands, the United States courts retain jurisdiction over crimes committed on such lands under the provision of the Act of March 3, 1885, as amended.[7]

5. Section 6 of the Indian Allotment Act, Act of February 8, 1887, 24 Stat. 388, 390, was amended by the Act of May 8, 1906, 34 Stat. 182, to provide: "That until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States."

6. And, in United States v. Chavez, 290 U. S. 357, 54 S.Ct. 217, 78 L.Ed. 360, the court held that the lands of the Pueblo of Isleta were Indian country within the meaning of R.S. § 2145, notwithstand-

ing such lands were held and occupied by the people of the Pueblo in communal ownership, under a grant made during Spanish sovereignty, recognized by Mexico, and confirmed by the United States, primarily because the people of the Pueblo were wards of the United States and, therefore, under its jurisdiction.

7. Yohyowan v. Luce, D.C.Wash., 291 F. 425, 427, 428; United States v. Celestine, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195; United States v. Sutton, 215 U.S. 291, 294, 30 S.Ct. 116, 54 L.Ed. 200; Davis v. United States, 9 Cir., 32 F.2d 860;

After the decision of the Supreme Court in Ex parte Crow Dog, 109 U.S. 556, 3 S. Ct. 396, 27 L.Ed. 1030, holding that R.S. § 2145, supra, did not give United States courts jurisdiction over offenses committed by one Indian against another Indian in Indian country, it was discovered that such offenses were going unpunished, and it was to remedy that situation that the Act of March 3, 1885, was enacted.[8] Prior to the enactment of the latter Act, crimes by Indians against Indians were left to be dealt with by each tribe for itself, according to its local customs.[9]

In United States v. Kagama, 118 U.S. 375, 382, 6 S.Ct. 1109, 1113, 30 L.Ed. 228, the court said: "The Case of Crow Dog, 109 U.S. 556, 3 S.Ct. 396 [27 L.Ed. 1030], in which an agreement with the Sioux Indians, ratified by an act of Congress, was supposed to extend over them the laws of the United States and the jurisdiction of its courts, covering murder and other grave crimes, shows the purpose of Congress in this new departure. The decision in that case admits that if the intention of Congress had been to punish, by the United States courts, the murder of one Indian by another, the law would have been valid. But the court could not see, in the agreement with the Indians sanctioned by Congress, a purpose to repeal section 2146 of the Revised Statutes, which expressly excludes from the jurisdiction the case of a crime committed by one Indian against another in the Indian country. The passage of the act now under consideration [10] *was designed to remove that objection, and to go further by including such crimes on reservations lying within a state.*" (Italics mine.)

It will be observed that, with respect to an offense committed by or against an Indian, who is subject to the exclusive jurisdiction of the United States, and on lands over which the United States retains jurisdiction, the Supreme Court has placed a broad construction upon the phrase "Indian country" as used in R.S. § 2145.

I think the same broad construction should be placed upon the phrase "Indian reservation" as used in the Act of March 3, 1885, as amended, with respect to offenses embraced in such Act and committed by Indians against Indians on Indian allotments, at a time when the United States retains exclusive jurisdiction over the allottee and jurisdiction over the allotted land.

It is my opinion that so long as title to the allotted lands selected by the members of the Comanche, Kiowa, and Apache tribes of Indians, and carved out of the lands ceded and relinquished to the United States, continue to be held in trust by the United States, and such lands continue to be set apart for the exclusive use and occupancy by the members of the three tribes without the right of alienation, and so long as the United States retains exclusive jurisdiction over the Indian allottees and jurisdiction over such lands, such lands and the 480,000 acres of grazing land set aside for the use in common by such tribes, should be regarded as an Indian reservation, although the original reservation was reduced by the cession and relinquishment of other lands to the United States.

For the reasons indicated, I think the sentencing court had jurisdiction of the offense and that the judgment should be affirmed.

Ex parte Pero, 7 Cir., 99 F.2d 28, 34, 35; Ex parte Wallace, Okl.Cr.App., 162 P. 2d 205, 208.

8. Donnelly v. United States, 228 U.S. 243, 270, 33 S.Ct. 449, 57 L.Ed. 820.

9. Ex parte Crow Dog, 109 U.S. 556, 571, 572, 3 S.Ct. 396, 27 L.Ed. 1030; Donnelly v. United States, 228 U.S. 243, 270, 33 S.Ct. 449, 57 L.Ed. 820.

10. The Act of March 3, 1885.