**Nathan Jerry ELLIS, Appellant,**

v.

**Ray H. PAGE, Warden, Appellee.**

**No. 8197.**

United States Court of Appeals
Tenth Circuit.

Sept. 13, 1965.

Peter J. Crouse, Denver, Colo., for appellant.

Joseph C. Muskrat, Oklahoma City, Okl., (Charles Nesbitt, Atty. Gen., and Charles L. Owens, Tulsa, Okl., on brief), for appellee.

Before MURRAH, Chief Judge, and HILL and SETH, Circuit Judges.

MURRAH, Chief Judge.

This habeas corpus proceedings involves Oklahoma state jurisdiction of the offense of murder by one Cheyenne Indian against another for which the petitioner was tried and convicted in Custer County, Oklahoma.

After conviction on trial and retrial (See Ellis v. State, Okl.Cr., 318 P.2d 629, Id., Okl.Cr., 331 P.2d 415) and denial of a writ of habeas corpus on non-jurisdictional grounds in Ellis v. Raines, Okl.Cr., 351 P.2d 407 and Ellis v. Raines, 10 Cir., 294 F.2d 414; 368 U.S. 1000, 82 S.Ct. 628, 7 L.Ed.2d 538, petitioner for the first time challenged the jurisdiction of the state court in a petition to the Oklahoma Court of Criminal Appeals. The claim was that the alleged offense was committed on an "Indian reservation under the jurisdiction of the United States government * * *" within the meaning of 18 U.S.C. § 1151, hence "within the exclusive jurisdiction of the United States" under 18 U.S.C. § 1153; that the state court therefore lacked jurisdiction.

The Oklahoma court upheld state jurisdiction based upon its interpretation of the pertinent federal statutes and decisions. Relying primarily upon Tooisgah

v. United States, 10 Cir., 186 F.2d 93, the Court was of the view that while the alleged offense was committed on land once within the limits of the Cheyenne and Arapahoe Indian Reservation under the exclusive jurisdiction of the United States, the tribes had, by duly ratified agreement, ceded without any reservation whatsoever all of their claims, title and interest of any kind and character to the lands within the reservation to the United States, subject to allotments in severalty, including the situs of this offense; that when Congress ratified the treaty agreement, it thereby dissolved the Cheyenne and Arapahoe reservation as such, and the Indians were made subject to the laws, both civil and criminal, of the territory and later of the State of Oklahoma with the gift of citizenship and equal protection of the laws. See Ellis v. State of Oklahoma (Raines), Okl. Cr., 386 P.2d 326. Certiorari was denied. See Ellis v. State, 376 U.S. 945, 84 S.Ct. 801, 11 L.Ed.2d 768. The federal trial court adopted the findings and conclusions of the state court and denied the writ without a hearing.

Inasmuch as state court jurisdiction turns acutely on the interpretation of federal law and is challenged in the federal court for the first time after exhaustion of state remedies, it seems appropriate to entertain the question as submitted in the trial court and here. See Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770; Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837.

The question is sharply drawn and simply put by the state as whether at the time of the alleged offense the Cheyenne and Arapahoe reservation had been disestablished and was non-existent. If not, exclusive jurisdiction was in the United States, the state court lacked jurisdiction, and the writ should issue. We agree with the state and trial courts.

Tooisgah v. United States, supra, involved an offense defined in § 1153 on what was originally the duly established Comanche, Kiowa and Apache reservation. Conversely to our facts, the petitioner there had been charged, tried and convicted in the federal court. We issued the writ and discharged the petitioner because we were ultimately of the view that the reservation had been completely disestablished by the Treaty of October 21, 1892 (ratified June 6, 1900), 31 Stat. 676, by the terms of which the tribes occupying the reservation did "cede, convey, transfer, relinguish and surrender, forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest, of every kind and character, in and to the lands embraced" within the reservation. Here the Cheyenne and Arapahoe Treaty of October, 1890 (ratified in 1891), 26 Stat. 1022, contains indistinguishably similar language, and the Tooisgah case undoubtedly controls the jurisdictional question in this case unless it has been overruled sub silentio in Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346. The petitioner relies on Seymour as applicable and controlling.

In that case the Supreme Court sustained the exclusive federal jurisdiction of the offense which was admittedly committed on lands originally designated and established as an Indian reservation and which the state court thought was disestablished by the Act of March 22, 1906, 34 Stat. 80. The Act provided for the sale of mineral lands and for "settlement * * * under the homestead laws of other surplus lands remaining on the diminished Colville Reservation after allotments were first made and patents issued". The proceeds of the sale and disposition of the surplus lands were deposited in the Treasury of the United States "to the credit of the Colville and confederated tribes of Indians belonging and having tribal rights on the Colville Indian Reservation" to be expended for their benefit under the direction of the Secretary of Interior. By Act of Congress in 1892 (27 Stat. 62) a part of the Colville Indian Reservation had been "vacated and restored * * * to the public domain" and comparing the critical language of the 1892 and 1906 Acts, it was clear to the Supreme Court that "the purpose of the 1906 Act was neither

to destroy the existence of the diminished Colville Indian Reservation nor to lessen federal responsibility for and jurisdiction over the Indians having tribal rights on that reservation"; that "[t]he Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." The Court was moreover of the opinion that subsequent legislation and treatment of the lands in question as a "reservation" made it undeniably clear that at the time of the commission of the offense the reservation was still in existence. Id. 368 U.S. 356, 82 S.Ct. 424.

We followed the Seymour case in Hildebrand v. United States, 287 F.2d 886, Id. 10 Cir., 327 F.2d 205, where federal court jurisdiction was challenged on the contention that the offense was committed within the boundaries of an Indian reservation but on a tract of land within the reservation previously conveyed to a church. Following Seymour, we held consistently with well established principles also recognized in Tooisgah that the allotment of lands in severalty or the conveyance of land to non-Indians did not operate to disestablish the reservation or create a state jurisdictional enclave within the limits of the reservation.

The Comanche, Kiowa and Apache Treaty in Tooisgah and the Cheyenne and Arapahoe Treaty involved here were negotiated treaties or agreements between the government and the Indian tribes by which in consideration of the payment of money and allotments in severalty the tribes did "cede, convey, transfer, relinquish and surrender, forever and absolutely, without any reservation", all their claim in and to the lands embraced within the designated reservation. While the words of alienation employed in the treaties do not formally disestablish the reservations, we think they have the unequivocal effect of doing so. In treaty parlance they are as appropriate to disestablish the reservations as the Congressional words "vacate and restore" employed in the 1892 Act to disestablish a portion of the Colville reservation. And, the critical language is textually and contextually different from that employed in the 1906 Act to authorize the Secretary of Interior to "sell or dispose of unallotted lands in the diminished Colville Indian reservation". It is one thing to open an Indian reservation to mineral exploitation, allotment to Indians, and non-Indian homesteaders by Congressional enactment as in Seymour. It is quite another to agree by treaty to cede and relinquish all claim, title and interest in the lands within the limits of a reservation.

As part consideration for the "cession of territory and relinquishment of title, claim, and interest" in the lands within the reservation, the government paid the Indians $1,500,000, $1,000,000 of which was retained in the Treasury of the United States to the credit of the Indians. The $500,000 was to be distributed to the Indians for their immediate use and benefit. The treaty evinces a manifest purpose to dissolve tribal government and assimilate the Indian allottees in the community in which they lived as citizens and owners of land with a grubstake to enable them to compete on an equal footing with their non-Indian neighbors.

There is no contention here that the offense was committed on an Indian allotment "the Indian titles to which have not been extinguished" within the meaning of § 1151(c).

We adhere to Tooisgah and hold that the situs of the offense was not within the limits of an Indian reservation within the exclusive jurisdiction of the United States.

Judgment is affirmed.