**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Harold Ed BURNETT, Defendant-Appellant.**

No. 84–1453.

United States Court of Appeals, Tenth Circuit.

Nov. 21, 1985.

594

Art Fleak, Tulsa, Okl., for defendant-appellant.

Keith Ward, Asst. U.S. Atty. (Layn R. Phillips, U.S. Atty., and Ben F. Baker, Asst. U.S. Atty., on brief), Tulsa, Okl., for plaintiff-appellee.

Before HOLLOWAY, C.J., LOGAN, Circuit Judge and CARRIGAN, District Judge*.

CARRIGAN, District Judge.

Harold Ed Burnett was convicted of first degree murder in the Northern District of Oklahoma. On appeal he asserts six grounds.

* Honorable Jim R. Carrigan of the United States District Court for the District of Colorado, sit-

First, Burnett argues that the United States District Court lacked subject matter jurisdiction. The issue turns on whether the site of the killing is in "Indian country" subject to federal jurisdiction under 18 U.S.C. § 1153 (1982). If it is not Indian country, the state of Oklahoma has exclusive jurisdiction.

The murder victim was Laban Marchmont Miles, a half-blood Osage Indian who was shot to death in his home on April 15, 1982. Miles resided on a restricted Osage homestead allotment near Pawhuska in Osage County, Oklahoma. On April 16, 1982, the District Attorney for Osage County filed an information charging Burnett, Michael L. Simpson, and Dale Lynn Jackson with first degree murder. Burnett and Jackson are also Indians. The state trial court, on its own motion, held that the State of Oklahoma lacked jurisdiction over the matter because the crime was committed in Indian country and thus federal jurisdiction was exclusive. The State of Oklahoma appealed and on November 7, 1983, the Oklahoma Court of Criminal Appeals affirmed the trial court's ruling. *State of Oklahoma v. Burnett*, 671 P.2d 1165 (Okla.Crim.App.1983).

Subsequently, an indictment was filed in the United States District Court for the Northern District of Oklahoma, charging Burnett, Simpson and Jackson with first degree murder. Burnett was tried by a jury and found guilty of first degree murder on February 24, 1984. He was sentenced to life imprisonment.

Pursuant to the Major Crimes Act, now codified as amended at 18 U.S.C. § 1153 (1982), the United States has exclusive jurisdiction over any Indian who allegedly has committed within Indian country any of fourteen enumerated crimes, including murder. That Act, as amended, provides in pertinent part:

"Any Indian who commits against the person or property of another Indian or

ting by designation.

other person any of the following offenses, namely, murder, manslaughter, kidnaping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

"Indian country" is defined as follows in 18 U.S.C. § 1151 (1982):

"Except as otherwise provided in sections 1154 and 1156 of this title [18 U.S.C. §§ 1154 and 1156], the term "Indian country", as used in this chapter [18 U.S.C. §§ 1151 et seq.], means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

Subsection (c) is the provision relevant here. Indian allotments were included in the definition of "Indian country" by authority of *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914), where the Supreme Court held that an Indian *trust* allotment, *i.e.*, a fee title held by the United States in trust for an Indian allottee, is Indian country. In *United States v. Ramsey*, 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039 (1926), the Supreme Court held that a *restricted* Osage allotment, in which fee title is held by an Indian allottee but the allottee cannot alienate the property without approval of the Secretary of the Interior, is also Indian country.

The parties stipulated in the district court that the land on which Miles was murdered was a restricted Osage allotment. (Record on appeal, pp. 27, 57, 62.) The United States argues that *Ramsey* governs the jurisdictional issue here.

■ Appellant, however, asserts that *Ramsey* is no longer good law. He argues that the Court's upholding of federal jurisdiction over crimes committed on a restricted allotment must be limited to recently allotted property while still held by the original "uncivilized" allottee. The victim here was not the original allottee of the land where he was killed; he inherited the allotment from his father, Laban Miles, Jr., in 1958. The 160-acre property was conveyed to Laban Miles, Jr., as his homestead allotment when the Osage Reservation was divided among its members in 1908 pursuant to the Act of June 28, 1906, ch. 3572, 34 Stat. 539, "An Act for the division of the lands and funds of the Osage Indians in Oklahoma territory, and for other purposes." In *Ramsey*, the Supreme Court held that the United States has authority over crimes committed within Indian country because:

"Indians are wards of the nation in respect of whom there is devolved upon the Federal Government 'the duty of protection, and with it the power.' *United States v. Kagama*, 118 U.S. 375, 384 [6 S.Ct. 1109, 1114, 30 L.Ed. 228]. The guardianship of the United States over the Osage Indians has not been abandoned; they are still wards of the nation, *United States v. Osage County*, 251 U.S. 128, 133 [40 S.Ct. 100, 101, 64 L.Ed. 184 (1919)]; *United States v. Nice*, 241 U.S. 591, 598 [36 S.Ct. 696, 697, 60 L.Ed. 1192 (1916)]; and it rests with Congress alone to determine when that relationship shall cease." 271 U.S. at 469, 46 S.Ct. at 560.

Burnett maintains that Congress has systematically limited its supervision over Indians, turning control over to state and tribal governments. In particular, Burnett asserts that Congress has relinquished its guardianship over Osage restricted allot-

ments, terminating any basis for federal jurisdiction over crimes committed thereon. Burnett also relies on two Tenth Circuit cases, *Tooisgah v. United States*, 186 F.2d 93 (10th Cir.1950), and *Ellis v. Page*, 351 F.2d 250 (10th Cir.1965), in support of his assertion that the State has jurisdiction over an Indian charged with committing murder on a restricted allotment.

Appellant has failed to persuade us that *Ramsey* is no longer binding precedent. Initially, we note our agreement with the analysis and conclusion of the Oklahoma Court of Criminal Appeals in *State of Oklahoma v. Burnett, supra*, 671 P.2d 1165. Turning to the arguments raised here, we disagree with the appellant's assertion that federal supervisory control over the Osage has terminated. The 1906 Act that allotted the Osage Reservation, 34 Stat. 539, 541, provided in part that each member's homestead allotment was inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee, and that surplus allotments were inalienable for twenty-five years and nontaxable for three years unless a certificate of competency was issued to the allottee. An Osage Indian could obtain a certificate of competency authorizing him or her to sell and convey any of the land deeded under the Act, except the homestead, if the Secretary of the Interior determined that the tribal member was fully competent, and capable of transacting business and caring for his or her own affairs. The Act also provided that oil, gas, coal and other minerals covered by the allotted lands were reserved to the Tribe, with all revenue therefrom held in trust by the United States.

The original 1906 Act has been amended numerous times, including by Act of March 3, 1921, ch. 120, 41 Stat. 1249; Act of February 27, 1925, ch. 359, 43 Stat. 1008; Act of March 2, 1929, ch. 493, 45 Stat. 1478; Act of June 24, 1938, ch. 645, 52 Stat. 1034; Act of February 5, 1948, P.L. 408, 62 Stat. 18; Act of October 6, 1964, P.L. 88–632, 78 Stat. 1008; and Act of October 21, 1978, P.L. 95–496, 92 Stat. 1660. The amendments have repeatedly extended the periods governing Osage property interests

and have changed the nature of various restrictions on those interests. *See* F. Cohen, *Handbook of Federal Indian Law*, pp. 788–97 (1982 ed.), for a comprehensive discussion of restrictions on Osage property interests. As recently as 1978, Congress extended the trust and supervision periods until further act of Congress and provided that any Osage who had been issued a certificate of competency under any of the Acts of June 28, 1906, March 2, 1929 or February 5, 1948, could apply to the Secretary of the Interior to revoke the certificate, and thus return to the supervision of the Secretary. In sum, federal supervisory control, the essential quality which made a restricted Osage allotment Indian country in 1925 when *Ramsey* was decided, still exists to a significant degree today. We conclude that changes in federal supervision since 1925 have not been so substantial as to render *Ramsey* obsolete.

Likewise we hold that Burnett's reliance on *Tooisgah v. United States* and *Ellis v. Page, supra*, is misplaced. In neither case did this court decide the jurisdictional question contrary to *Ramsey*. *Tooisgah* dealt with an earlier version of the Major Crimes Act. When the murder in *Tooisgah* was committed in 1942, the statute provided for federal jurisdiction over the enumerated crimes when committed within any *Indian reservation* under the jurisdiction of the United States and we held this phrase to be narrower than "the term 'Indian country,' with its broad and flexible definition." 186 F.2d at 99. Further we held that the narrower phrase "Indian reservation" did not include the allotment on which the murder was committed.

In 1949 the Major Crimes Act was amended to substitute "Indian country" for "within any Indian reservation." Lands "within the limit of any Indian reservation" is only one of the three categories of Indian country defined in 18 U.S.C. § 1151 (1982). Substituting "Indian country" in § 1153 in 1949 broadened the provision to include the latter two categories of Indian country defined in § 1151 as well. *Ellis v. Page, supra*, is not helpful to Burnett, for it is

simply inapplicable. In *Ellis*, we stated: "There is no contention here that the offense was committed on an Indian allotment 'the Indian titles to which have not been extinguished'" within the meaning of § 1151(c). 351 F.2d at 252.

We are not unaware of the practical law enforcement difficulties arising from *Ramsey.* Criminal jurisdiction in Osage County, Oklahoma depends on the site of the crime; jurisdiction changes from property to property depending on the current status of the particular allotment on which the crime occurs. Congress has provided in Public Law 280, as amended, 25 U.S.C. §§ 1321 *et seq.* (1982), a statutory method by which a state, with the consent of the tribe, can assume jurisdiction over Indian country. The Osage Tribal Council has requested the State of Oklahoma to assume criminal jurisdiction over crimes committed within Indian country in Osage County. A state must take some affirmative action, either by constitutional amendment or legislation (if legislation is sufficient under state law), to extend jurisdiction over Indian country. In *State of Oklahoma v. Burnett,* 671 P.2d at 1167–68, the Oklahoma Court of Criminal Appeals held that Oklahoma has not acted to assume jurisdiction under P.L. 280. Thus the unfortunate patchwork nature of law enforcement in Osage County could be alleviated if Oklahoma chose to act, but that remedy is beyond the writ of this court.

As his second ground for appeal, Burnett asserts that the district court erred in (1) admitting certain testimony from Burnett's aunt, Bertha Poulton, (2) permitting improper cross-examination of James Dailey, (3) excluding evidence of threats allegedly made by the victim, and (4) refusing to inform the jury that it is a crime for a convicted felon to possess firearms. Upon review of the record, we conclude that if any of these rulings was in error, it did not amount to reversible error.

The third ground for appeal concerns the following events that occurred during the course of the trial. Burnett's counsel moved for a mistrial after the pros-

ecutor inquired of Burnett whether he had ever been present at another homicide scene and been required to testify in court. The trial judge granted the mistrial "without prejudice." Counsel then withdrew his motion, stating that he wanted a mistrial only if the court granted it "with prejudice." After examining Burnett to ascertain that he concurred in the withdrawal of the motion, the trial judge permitted the trial to proceed. Burnett argues that his due process rights were violated by permitting the trial to proceed, even though Burnett's counsel withdrew the motion for a mistrial and the appellant concurred in that decision. Appellant cites no precedent for his argument. We cannot agree that Burnett was denied due process under these circumstances.

As his fourth ground for appeal, Burnett argues that certain material in an F.B.I. report relating to the "violent propensity of the victim" was wrongfully withheld from him in violation of the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At the time the defendant made his request for this Brady material, the trial judge reviewed the report and found no Brady material. We have reviewed the material in issue and affirm the trial court's ruling on this matter.

Appellant's fifth ground for appeal is that the district court erred in instructing the jury as follows:

"You are further instructed that the laws of the State of Oklahoma provide that the right of self-defense cannot be asserted by one who is the aggressor or who entered voluntarily into difficulty armed with a deadly weapon."

Burnett asserts that this instruction did not correctly state Oklahoma law. He is in error. The Oklahoma Court of Criminal Appeals has twice upheld virtually identical instructions. *Ruth v. State*, 581 P.2d 919 (Okla.Crim.App.1978), *cert. denied,* 440 U.S. 984, 99 S.Ct. 1797, 60 L.Ed.2d 246 (1979); *Price v. State*, 541 P.2d 373 (Okla. Crim.App.1975).

Burnett further asserts that the court should have considered his proferred instruction on self-defense from Devitt and Blackmar §§ 41.19, 41.20 and 41.23. The district court rejected the proposed instruction because Burnett's counsel offered it by merely reading from Devitt and Blackmar before closing arguments rather than by filing a written request for instruction as required by Fed.R.Crim.P. 30. According to appellant, Rule 30's requirement that instructions be submitted in written form is "a mere formality and waste of valuable trial preparation time." We cannot agree. Rule 30 facilitates the orderly and efficient conduct of trial. It makes possible the preparation of jury instructions before and during trial, thus minimizing last minute pressure with the concomitant increased likelihood of error incident to any rushed legal drafting. The district court did not err in rejecting a noncomplying instruction.

Finally, the appellant argues as his sixth ground for appeal that the trial court erred in denying his motion to dismiss the indictment for preindictment delay. Marchmont Miles was murdered on April 15, 1982. The District Attorney for Osage County filed an information the following day. The United States Attorney became aware of the case immediately but decided to allow the State to proceed in an attempt to resolve the jurisdictional issue. The Oklahoma Court of Criminal Appeals issued its ruling on November 7, 1983. Burnett was indicted in federal court on January 3, 1984. Appellant does not dispute that there was a genuine issue regarding jurisdiction. Indeed he has argued here, presumably in good faith, that the State of Oklahoma had jurisdiction over this action. Appellant has not adequately proved actual prejudice to his case or the existence of any ulterior motive on the part of the prosecution. *United States v. Francisco*, 575 F.2d 815 (10th Cir.1978); *United States v. Cueto*, 506 F.Supp. 9 (W.D.Okla.1979). Therefore his right to speedy trial was not violated.

AFFIRMED.