### LESTER BRANNON v. STATE.

No. A.-4090.   Opinion Filed July 28, 1923.
Rehearing Denied Sept. 15, 1923.
(217 Pac. 1060.)

(Syllabus.)

Homicide—Instructions on Law of Self-Defense Approved.  The instructions of the court relating to homicide, self-defense, and collateral issues examined, and held sufficient.

Appeal from District Court, Roger Mills County; T. P. Clay, Judge.

Lester Brannon was convicted of manslaughter in the second degree, and he appeals.   Affirmed.

H. L. Adkins and Sylvester Grim, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J.  The information in this case, filed August 25, 1920, charged the plaintiff in error, Lester Brannon, in this opinion referred to as the defendant, with the murder of Claude Wilson, committed on the 12th day of June, 1920.  At the trial,

March 12, 1921, defendant was found guilty of manslaughter in the second degree, and his punishment was fixed by the court at confinement in the state reformatory at Granite for a period of two years. From the judgment so rendered he appeals.

The defendant was 16 years of age in March, 1920, and with his parents had recently moved from near Elk City, in Beckham county, to near the town of Durham, in Roger Mills county, where the father bought a farm and established a home. Soon afterwards the defendant entered as a pupil in the consolidated school of Durham, where he continued to attend until the end of the term, a period of about four months. On the 12th day of June, following, there was a public meeting or picnic in the town of Durham, at which time there was a meeting of the local Grange, and a ball game between the home ball team and the ball club from Crawford, a town some miles distant. The defendant, with a schoolmate, Floyd Parks, went to the ball grounds and took a position about half-way between third base and the home plate on the outside of the diamond. Here they were soon surrounded by a number of young men and boys who engaged in vigorous yells and hurrahs for the purpose of encouraging or confusing the players on the opposite teams, as the case might be.

The evidence on the part of the defendant tended to show that 20 or 25 young men, most of whom were older and larger than the defendant, directed their hurrahs and hazing at him and that they closed in around him, took hold of him, and tore his coat, and slapped and buffeted him, until finally Claude Wilson, the deceased, gave him a punch. The defendant claims that from the conduct of the deceased and those apparently acting in concert with him he apprehended that he was about to receive further assaults and batteries, from which he would suffer great bodily harm. Defendant stated that at the time he

was punched by the deceased he told him to "holler" all he wanted to, but not to punch him again. From the testimony of others it seems that other remarks were made about that time indicative of a mutual combat, apparently a fist fight, in which both parties assumed striking attitudes at about the same time. As to just how many times and in what manner each was struck by the other evidence is conflicting, but in the course of the affray the defendant took an open knife from his pocket and struck the deceased, inflicting two knife wounds, one of which was not of a serious nature, but the other of which penetrated the neck below the ear, severing the arteries and blood vessels, and penetrating into the trachea near the epiglottis. The evidence of a number of witnesses was to the effect that at the time the deceased was so wounded he was retreating. It happened that there was a physician there, who came immediately, and by use of his fingers held the severed ends of the veins and arteries to prevent the deceased from bleeding to death and to prevent the blood from flowing into the trachea and thence into the lungs. Another physician was summoned, and eventually the severed veins and arteries were closed, and other medical treatment given. Under the care of physicians the wounded boy seemed to be on the road to recovery, but an infection developed in the wound in the trachea which, in the opinion of the physicians, caused the death of the deceased on August 14th, a little more than two months after he received the wounds.

The several assignments of error contained in the petition in error defendant's counsel have condensed into two reasons, which in their opinion are grounds for reversing the judgment of the trial court.

The first of these grounds is that the court erred in his instruction to the jury upon the question of the defendant's right

of self-defense, in giving instruction No. 11 1-2. The court in instruction No. 10 said, in effect, that, if it reasonably appeared to the defendant that the deceased at the time of the tragedy was making an unlawful or violent attack upon him in a manner capable of inflicting death or great bodily harm about to be perpetrated with that intent, the defendant's act would be justified. In instruction No. 11 the jury were instructed that a person who is unlawfully attacked is not bound to retreat in order to avoid the necessity of injuring his assailant or assailants, or of killing him or any one of them to save his own life or to avoid serious bodily injury, and that it is not necessary that it be shown that the danger did in fact exist, but that it is sufficient if it reasonably appeared to the defendant, from the circumstances, that such danger was imminent, and that if it did so appear defendant could defend himself to the same extent as he would be justified in doing if the danger was real. Then followed instruction No. 11 1-2, complained of by defendant:

"The law of self-defense is given to a citizen for his protection, and it cannot be pleaded as a defense by one who is the aggressor and who enters voluntarily into a difficulty armed with a deadly weapon with the intent then and there to take the life of the deceased or to do him some serious bodily injury, no matter in how much danger he may be placed in the course of the difficulty, nor how imminent his peril may become."

Instruction No. 12 related to the appearance of danger and the extent thereof and the degree of force necessary or sufficient to repel it. Instruction No. 13 related to the use of force greater than reasonably appears necessary. Instruction No. 14 related to real and apparent danger. Instruction No. 15 stated that self-defense is a defensive act, and not an offensive act, and further admonished the jury that the accused should use all reasonable means possible under the circumstances to avoid

the taking of human life except that he is not bound to retreat to avoid such necessity or apparent necessity provided he has done no act on his part to bring about the attack or threatened attack.

It is urged that instruction No. 11 1-2, above quoted, deprived the defendant of his right of self-defense, upon authority of Gibbons v. Territory, 5 Okla. Cr. 212, 115 Pac. 129, and of Boyer v. State, 16 Okla. Cr. 388, 183 Pac. 620. We think that instruction No. 11 1-2, together with the other instructions preceding and following, was not misleading, and that the defendant was not deprived of the consideration of the facts before the jury tending to establish justifiable homicide in self-defense. The declaration that "self-defense cannot be pleaded by one who is the aggressor or who enters voluntarily into a difficulty armed with a deadly weapon, with the intent then and there to take the life of the person assailed or to do him serious bodily injury," is not contained in words or substance in the instructions given in the Boyer Case. In the Gibbons Case the facts are in no way similar to the facts in this case. The instructions given in the Gibbons Case and the refusal to give certain requested instructions were held to constitute error; but a close analysis of that case will disclose that the holding of the court therein cannot be construed as in conflict with the instructions of the court given in this case.

The second alleged error urged is the refusal of the court to give defendant's proffered instruction No. 2, as follows:

"You are instructed that, when there is more than one person engaged in the making of an assault, the person upon whom the assault is being made has the right to act upon the hostile demonstration of either or all of the persons so engaged, and in so acting upon such demonstration he has the right to use, as against either or all of the persons so engaged just

such force as may reasonably appear to him, viewed from his standpoint and no other, to be necessary to protect his life or to prevent serious bodily injury; and if in so acting the defendant takes the life of one or more of his assailants he is not guilty.''

This contention is not well taken, for the reason that in the instructions given by the court the jury were admonished that the defendant had a right to protect himself, and to consider the hostile demonstrations of the deceased, along with those of all the other persons apparently acting in concert with him.

There were 28 different instructions given, covering, so far as we are able to determine, every phase of the law of homicide, self-defense and collateral questions related thereto. We find no reversible error in the instructions given or in the refusal of the instructions requested by the defendant.

Reference is made in defendant's brief to the evidence of the previous good character of the defendant, to the fact that he was a mere boy, who had never been in any previous difficulty, and that the matters and things provoking the difficulty indicated that there was no intention on his part to take human life, but merely an effort to fight his way to liberty; that the blows were directed at no particular part of the body of the deceased and that in a sense the wounds inflicted were accidental. All these matters were for the consideration of the jury, and doubtless were by them so considered. The jury were better able to determine the provocation, and who was the probable aggressor, and to judge of the motives of the participants in the difficulty.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.