Homer PRICE, Appellant,

v.

The STATE of Oklahoma.

No. F–75–375.

Court of Criminal Appeals of Oklahoma.

Oct. 8, 1975.

Leslie R. Earl, Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Doug Combs, Legal Intern, for appellee.

OPINION

BLISS, Judge:

Appellant, Homer Price, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–72–1321, for the offense of Murder in violation of 21 O.S. 1971, § 701. His punishment was fixed at Life imprisonment, and from said judgment and sentence defendant failed to perfect a timely appeal to this Court. The District Court, Tulsa County, denied defendant's petition for Post Conviction Relief, Case No. PC–74–769. From this denial the defendant perfected an appeal to this Court, in which we reversed the trial court and granted the defendant's petition for an appeal out of time, the merits of which are herein considered.

The State's first witness at trial was 15-year-old Brenda Louise Gordon, who resided with her mother, Mary Jean Gordon, at 1548 North Frankfort Avenue in Tulsa, Oklahoma. In the early morning hours at approximately 2:30 a. m. on the morning of July 15, 1972, the witness testified that she saw Homer Price, the defendant, with three other persons, Judge Brandon, later killed by the defendant, Evelyn Scott, girlfriend of Judge Brandon, and another young man whom the witness did not know. The witness was in front of her house with her boyfriend, Garland Parker, when the other four persons, all in defendant's car, pulled up and asked the witness where her mother was. The witness told the defendant where her mother was and the defendant left. About one hour later the witness saw the defendant again in his car with his friends and her mother, Mary Jean Gordon. The defendant and Mary Jean were arguing outside the car which was stopped next to a Git–N–Go Store. The witness did not know what they were fighting about, but Mary Jean wanted to get in the car with the witness and Garland but the defendant would not let her. As a result of the argument, Evelyn Scott drove the defendant's car and followed Garland Parker, the witness, Mary Jean and the defendant to Mary Jean's house. When they arrived at the Gordon home the defendant attempted to get his keys from Evelyn Scott who had driven his car over to the Gordons'. Evelyn refused to give the keys to the defendant because she was afraid that the defendant would leave her stranded in Tulsa. The defendant and his three friends had driven to Tulsa from Lawrence, Kansas, that evening. The defendant told Evelyn that he only wanted the keys so he could get the tape deck out of the trunk. When Evelyn again refused to give him the keys he reached into his car and aroused Judge Brandon, who had been asleep in the back seat. Judge was angry from being awakened and he and the defendant began to argue. The argument grew into a fight, during which Judge and Homer went into the yard of a neighbor. After the fight Mary Jean went into her house and the witness and everyone else left with the exception of the defendant who just laid in the yard where he had fought.

When the witness and Garland Parker arrived back at the house the defendant had been stabbed by Mary Jean, and there was some discussion about taking him to the doctor. The defendant refused to see a doctor and insisted upon going to his mother's house, who also lived in Tulsa. Upon his request, the entire group of people went to the home of the defendant's mother. When they arrived at his mother's house the defendant's nieces, Loretta and Luella, as well as the defendant's mother, were already there. They listened to music for about half an hour until the defendant's mother left the house. Judge Brandon, Mary Jean Gordon and Evelyn Scott all went to sleep in the living room while the children went into a back bedroom to listen to music. The witness testified that while she, Loretta, Luella and the other young man went into the back bedroom the defendant and Garland left in defendant's car. About an hour later the defendant and Garland came back with some beer but remained there for only a minute or two and then left again. Then, about 45 minutes later Garland and the defendant again returned. The witness further testified that when they returned Mary Jean, Judge, and Evelyn were still asleep. Garland went back into the hallway with Brenda where they began to neck. After they had been kissing in the hallway for about five minutes they heard three shots which sounded like a gun, the noise coming from the living room. Moments later when she went into the living room she saw Judge lying on the floor with blood around his head. She testified that her mother and Evelyn Scott were in the living room at the time of the shooting. She further stated that while she was in the hall-

way, just before the shooting, she heard no argument whatsoever.

The State's next witness was Garland Parker whose testimony substantially supported that of Brenda Gordon. The testimony of Garland Parker will only be presented herein as it is inconsistent with or adds to the testimony of Brenda Gordon.

Garland testified that just prior to the fight between defendant and Evelyn, after Judge had been awakened, he grabbed a pistol from Evelyn. Judge then said he did not need a pistol to whip the defendant. After the fight was over and just before Judge left with the others, Judge sat on the curb and played with the pistol. As to the second time that Garland and the defendant left the other group, after arriving at the defendant's mother's home, Garland testified that the defendant drove him to a pawnshop where the defendant pawned his tape deck for a rifle. He further testified that he did not know what kind of gun it was, nor did he shoot it, load it, or even handle it. Garland was not even sure whether the defendant had placed the gun in the back seat or in the trunk. On their way back to the house, the defendant stopped and bought a six pack of beer. He testified that when they arrived back at the house after purchasing the rifle, Judge was asleep on the couch. As to the shooting itself, Garland testified that he was not sure whether he had heard two or three shots. In relation to the events of the whole morning, Garland testified that tempers had quieted by the time of the shooting. He also testified that when he was in the living room, after Judge had been shot, he saw no pistol anywhere in the living room near or far from the body of Judge Brandon.

The State's next witness was J. B. Terrell who identified the defendant as the man who had purchased a Springfield .22 bolt-action rifle with a clip on the morning of July 15, 1972. Terrell filled out the firearms transaction record to which the defendant, Homer Price, had affixed his signature.

Mary Jean Gordon, the State's next witness, testified that the defendant had called her at about 9:30 p. m. on July 14, from Lawrence, Kansas, and informed her that he was preparing to leave for Tulsa. The defendant, after arriving in Tulsa, reached her at her neighbor's house where the defendant had been directed by Brenda Gordon, Mary Jean's daughter. The witness testified that the defendant lived with Judge Brandon in an apartment in Lawrence, Kansas. She further stated that the defendant had often spent weekends in Tulsa. After leaving the neighbor's home, where the defendant had located Mary Jean, the party of five went to the corner bar and had some beer and watched the defendant and Judge play a couple of games of pool. After leaving the corner bar, they proceeded to Eugene Peal's house where they stayed for about 30 minutes. It was on their way to Mary Jean's house when the defendant and the witness, Mary Jean, began to argue about the defendant's driving after having consumed so much beer. They happened to meet Brenda Gordon and Garland Parker by the Git–N–Go where the witness and the defendant argued for about ten more minutes. Following this argument, as was previously testified by Brenda Gordon, Evelyn Scott drove the defendant's car following Garland Parker to the witness' house. As to the events leading up to the fight, the witness' testimony substantially complied with the previous testimonies. However, Mary Jean testified that Evelyn Scott pulled a gun on the defendant and the defendant pulled what looked like a knife. Then the events took place which led Judge Brandon to fight with the defendant. She, Mary Jean Gordon, testified, as did Garland Parker, that Judge Brandon took the gun from Evelyn Scott and during the fight he held the pistol in one hand and hit the defendant with the other hand. The witness then

continued testifying, as had Garland Parker, that she went inside her house while everyone except the defendant went to get something to drink. After a few minutes she went outside and began to talk to the defendant. He became angry and asked the witness if she had said that she wanted Judge Brandon to kill him, the defendant. She answered in the negative and he became very angry and hit her. They were in the carport at this time and the witness went into the house to get a butcher knife, and when the defendant tried to get into the house she stabbed him in the stomach. The defendant began to bleed profusely and she told her children to get some cold towels for compresses which they promptly did.

From this point until the time of their arrival at the defendant's mother's house the testimony of Brenda Gordon adequately portrays the events.

The witness testified that she went to sleep in the living room of the defendant's mother's home and the next thing that she remembered was the defendant leaving the house with Garland. She again awoke when the defendant returned. He had with him a six pack of beer which he had purchased at the store and he took this to the kitchen. The witness further testified that the defendant then went back out the front door and did not return for four or five minutes. She heard the defendant open the front door and then she heard "a click" and a "bang," at which time she looked up and saw the defendant with a rifle pointed at Judge Brandon who was lying asleep on the couch. As she looked at Judge Brandon she saw blood flowing from Judge's jaw. Before she could get up she heard a second "click" and "bang" as the defendant shot again. Immediately after the second shot she grabbed the gun but could not pull it away before the gun discharged the third time, following the clicking sound that she had heard immediately before each of the first two shots. After the third shot the witness testified that the defendant took the rifle and ran out the door. She further stated that this shooting did not take place until four or five hours after the fight between the defendant and Judge Brandon.

The State's next witness was Ray Lambert, a Firearms Examiner for the State of Oklahoma. Mr. Lambert testified that the bullets recovered from the scene of the shooting and from the body of the deceased were all fired from the .22 rifle purchased by Homer Price, the defendant. He further testified that the rifle was a bolt-action .22 Springfield rifle and that each time before it could be fired the spent cartridge would have to be ejected and the bolt recocked. He stated the gun could not be operated otherwise.

Bill McCracken, a Detective of the Tulsa Police Department, was the State's next witness. He testified that when he arrived at the scene of the shooting the body had already been removed, but a chalk diagram was sketched on the floor. He noted that there was blood on the couch in the seat portion, and that there was a considerable quantity of blood on the floor where the head of the deceased had rested. He further noted that there were three shell casings located on the floor of the living room and from his investigation he determined that the shots had been fired from just inside the door of the house. This placement complies with the testimony of Mary Jean Gordon.

The State's next witness was Dr. Leo Lowbeer, the medical examiner who performed the autopsy on Judge Brandon. The witness testified that the body had been shot three times. The first bullet pierced the lip shattered the jaw and penetrated through the neck and lodged in the deceased's shirt. The second bullet went through the chest wall, grazed the lung and heart and passed through and lodged in the loose skin before exiting the body. The third bullet went into the back of the shoulder and passed through the body exiting out the front of the body. He further testified that the trajectory of the bullet on

entry, passing through the lip, could not possibly have been fired into the deceased while the deceased was standing. He stated that most likely the deceased was lying down as Mary Jean Gordon had testified. The cause of death was the passage of the second bullet through the lung and heart.

Thereafter the State rested.

The 39 year old defendant, Homer Price, testified in his own behalf. Only those parts of the testimony which are contra to that which has been herein before set forth will be discussed.

The defendant testified that he and Mary Jean Gordon had been arguing because another woman, named Dorothy, talked to him while he was playing pool at the corner bar. He stated this was why he and Mary Jean Gordon were arguing when Brenda Gordon and Garland Parker saw them at the Git-N-Go. The next point of variance comes during the argument with Evelyn Scott when she pulled a gun. However, the defendant insists that he had no knife and that he had nothing in his hands while demanding the keys from Evelyn Scott. He also testified that during the ensuing fight with Judge Brandon, Judge hit him in the head with the gun and caused him to bleed. Further, after Judge hit him with the gun, Judge pointed the gun to his (defendant's) head and said that he would kill the defendant if the defendant's mother found out about the fight. The defendant then testified that after Judge and the others, with the exception of Mary Jean, left he went into Mary Jean's house to wash the blood out of his hair when Mary Jean, who was still angry because of Dorothy, walked up and stabbed him in the stomach. The defendant next testified that when he arrived at his mother's house, she saw the blood and asked him what had happened and someone else said, "Judge and Homer got into a fight." He testified that his mother showed no reaction of any kind to that remark.

It might be noted here that none of the other witnesses when questioned as to any blood on the defendant's head saw any blood at any time on the defendant.

The defendant then testified that when he arrived back at his mother's house after leaving with Garland Parker for the first time he came in and sat down on the couch, Judge woke up, saw him and went for the pistol in his pocket, but the defendant testified that he ran out of the front door before Judge could fire. He further testified that he went to buy the gun because he knew that Judge would try to kill him since his mother had found out about the fight. He stated that he was scared of Judge Brandon because he had seen him beat up other men on previous occasions. He further testified, contrary to Garland Parker, that on the way home after buying the gun Garland Parker loaded and fired the gun to see how it would shoot. When arriving after the purchase of the gun, the defendant testified that Garland went into the house first. He stated that he came in a moment later and was going to put some beer, which he had just purchased, in the refrigerator when Judge woke up and again went for his gun. The defendant testified that he dropped the beer on the table, went outside, got the gun and went back into the house. He stated that he was scared that Judge was going to shoot him so he opened the door and saw that Judge was standing directly in front of the door. He testified that Judge began to take a step forward and at that time he shot Judge, who dropped the gun to the carpet, grabbed his stomach and sank to the floor. At that time he maintains that Mary Jean Gordon grabbed the gun and while they were wrestling over it the gun accidentally discharged hitting Judge. He then testified that Mary Jean was not in the room at the time of the shooting and that she only arrived in time to grab the gun and see Judge lying on the floor. He maintains also that the gun was only fired twice which is not consistent the results of the autopsy or the investigation by police officers which indicated that three shots were fired. The defendant, when asked

how the bolt-action gun discharged accidently while he and Mary Jean Gordon were wrestling over it, stated that after firing the first shot he cocked it just before she grabbed it.

Thereafter the defense rested.

The State called three rebuttal witnesses, the first being Tulsa Police Officer Larry Bales, who testified that he checked the personal belongings of the deceased after the deceased was taken to the morgue. He found a pistol deep in the front pocket of the deceased. He also testified that the pistol was not loaded and that the pin which holds the cylinder in place was not in the gun but was in the other pocket, thus the cylinder would not stay in place unless it was held in place by hand.

The next rebuttal witness was Bobby Gordon, the son of Mary Jean Gordon. He testified that when his mother stabbed the defendant the defendant was outside the door as Mary Jean had testified. He also stated that at no time had he noticed any blood on the defendant's head. Bobby Gordon further testified that while everyone was over at Mary Jean's house Homer spoke to him and said that he was "going to get" Evelyn Scott and Judge Brandon.

The last rebuttal witness was Garland Parker who testified that no one placed a pistol in Judge's pocket from the time of the shooting until the time that Judge was taken away by the ambulance.

■ Simply stated, as the defendant's first assignment of error, he contends that there is no evidence in the record sufficient to establish premeditated intent. In *Clouse v. State,* Okl.Cr., 389 P.2d 1002 (1964), this Court said:

". . . The rule is well settled that if from all the facts and circumstances attending the killing the jury can reasonably and satisfactorily infer the existence of the premeditated design or intention to kill, they will be warranted in so doing. . . ." (at page 1006)

In reviewing the transcript in its entirety, this Court does not hesitate to hold that

the jury, in finding the existence of a premeditated design, did so on more than reasonable facts and circumstances than would have been necessary to warrant such an inference. The circumstances attending the killing have been adequately set out in the facts herein. However, to point out those facts which justify this inference, this Court would refer the reader to: (1) the testimony of Bobby Gordon, the State's second rebuttal witness, who testified that Homer Price, the defendant, told him that he was "going to get" Evelyn and Judge; and, (2) the testimony of Mary Jean Gordon which placed the deceased asleep on the sofa at the time the defendant operated the bolt-action lever to the Springfield .22 rifle and shot three times into the body of the deceased. These facts coupled with the evidence that the defendant purchased the gun immediately prior to the fatal shooting allows, as aforesaid, more than reasonable evidence on which a premeditated design to effect the death of Judge Brandon could have been inferred. The defendant's first assignment of error is without merit.

■ The defendant's second assignment of error refers to arguments made by the prosecutor during closing statement. The defendant contends that the District Attorney used language that was so inflammatory and so prejudicial that it aroused the passions and prejudices of the jury. However, the defendant cites no authority whatsoever in support of this contention. In *Battle v. State,* Okl.Cr., 478 P.2d 1005 (1970), this Court cited with approval *Sandefur v. State,* Okl.Cr., 461 P.2d 954 (1969), which held:

"It is necessary for counsel for Plaintiff in error not only to assert error, but to support his contentions by both argument and the citations of authorities. Where this is not done, and it is apparent the defendant has been deprived of no fundamental rights, this court will not search the books for authorities to support the mere assertion that the trial court has erred."

In reviewing the arguments of counsel for the State, this Court is of the opinion that nothing therein constitutes error of a fundamental nature. Therefore, this Court determines that the defendant's second assignment of error is without merit.

The defendant's third assignment of error is predicated upon instructions by the trial court regarding the defense of self-defense. Their instruction reads as follows:

"[H]owever, you are instructed that the right of self-defense is given to the citizen for his protection and it cannot be pleaded as a defense and relied upon for an acquittal by one who, himself, is the aggressor, or by one who enters voluntarily into a difficulty, armed with a deadly weapon, no matter in how much danger he may be placed in the course of the difficulty, nor how iminent (sic) his peril may become during the course of the difficulty."

In *Martley v. State,* Okl.Cr., 519 P.2d 544 (1974), citing with approval *Brannon v. State,* 24 Okl.Cr. 362, 217 P. 1060 (1923), this Court dealt with instructions which are almost identical in context and meaning. In *Martley,* supra, this Court stated that had the facts not been sufficient to justify such an instruction such an instruction would have been improper. *Townley v. State,* Okl.Cr., 355 P. 2d 420 (1960). However, where the evidence adduced at trial is sufficient to warrant such an instruction, and when that instruction is clear and not confusing and when that instruction properly states the law regarding self-defense, it is not error to include such an instruction. In the instant case, this Court is of the opinion that the facts and circumstances demand such an instruction. Further, the instruction is not confusing and is an accurate statement of the law regarding self-defense. Consequently, this Court is of the opinion that the instruction complained of herein was proper and will not serve as a basis for modification or reversal. The defendant's third assignment of error is without merit.

Finding no error which would constitute modification or reversal, the judgment and sentence appealed from is hereby, accordingly *affirmed.*

BRETT, P. J., and BUSSEY, J., concur.