CONOCO INC., a Delaware corporation, Phillips Petroleum Company, a Delaware corporation, Atlantic Richfield Company, a Pennsylvania corporation, Gulf Oil Corporation, a Pennsylvania corporation, the Superior Oil Company, a Nevada corporation, Marathon Oil Company, an Ohio corporation, Chevron U.S.A. Inc., a California corporation, Plaintiffs,

v.

SHOSHONE AND ARAPAHOE TRIBES, Robert N. Harris, Sr., Chairman and Frank L. Enos, Enos J. Enos, Benjamin Snyder, Sr., Alfred Ward, and Wesley L. Martel, members of the Shoshone Business Council; Joseph Oldman, Chairman, and Ernest Hanway, Burton Hutchingson, Patrick Goggles, Wayne Felter and Eugene Ridgeley, Sr., members of the Arapahoe Business Council and James G. Watt, Secretary of the Interior, Defendants,

and

Getty Oil Company and Shell Oil Company, Intervenors.

AMOCO PRODUCTION COMPANY, a corporation, Plaintiff,

v.

Robert N. HARRIS, Sr., Chairman, and Frank L. Enos, Enos J. Enos, Star Weed, Alfred Ward and Wesley L. Martel, Members of the Shoshone Business Council; Joseph Oldman, Chairman, and Ernest Hanway, Burton Hutchingson, Patrick Goggles, Wayne Felter and Eugene Ridgeley, Sr., members of the Arapahoe Business Council, James G. Watt, Secretary of the Interior, Defendants,

and

Shoshone and Arapahoe Tribes of the Wind River Reservation, Intervenors.

Nos. C80–0181–K, C80–208–K.

United States District Court, D. Wyoming.

Aug. 31, 1983.

Houston Williams, Williams, Porter, Day & Neville, Casper, Wyo., Thomas H. Burton, Conoco Inc., Houston, Tex., and Paul B. Godfrey and James L. Huemoeller, Godfrey & Sundahl, Cheyenne, Wyo., for plaintiffs.

Reid Chambers, Sonosky, Chambers, Sachse & Guido, Washington, D.C., Scott McElroy, Fredericks & Pelcyger, Boulder, Colo., and John Masters, Dray, Madison & Thomson, Cheyenne, Wyo., for Tribal defendants.

## MEMORANDUM OPINION

KERR, District Judge.

These cases arise from an oil and gas severance tax imposed by the Shoshone and

Arapahoe Tribes upon oil companies producing oil and gas from land leased on the Wind River Indian Reservation. The specific facts giving rise to the case and the proceedings up to this point are set forth below.

The Shoshone and Arapahoe Tribes are federally recognized Indian tribes residing on the Wind River Indian Reservation and are beneficial owners of the mineral interests in the Reservation lands. Leases are granted to various oil companies for oil production on the land. Since 1938 leases have been granted by the Tribes and approved by the Secretary of the Interior. The Tribes are governed by separate bodies, the Shoshone Business Council and the Arapahoe Business Council. The councils act jointly in matters affecting both Tribes. Neither Tribe was organized under the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. §§ 461–479, and neither Tribe has a written constitution.

On December 12, 1978 the Tribal Councils, acting jointly, enacted Ordinance 39 which provides in relevant part:

> Any person or entity engaged in the production of oil and gas from land or minerals held in trust by the United States (hereafter 'trust oil and gas') for the Shoshone Indian Tribe and the Arapahoe Indian Tribe (hereafter 'Tribes'), or for any individual Indian, located within the exterior bounds of the Wind River Reservation ... shall, for the privilege of doing business on the reservation pay one-half of one percentum of the market value at the well of all oil and natural gas produced, saved and sold or transported from the field where produced (hereafter 'trust oil or gas'); *Provided* that the tax imposed by this Ordinance shall not apply to the following:
>
> a. Any interest of the Tribes in such trust oil and gas;
>
> b. The royalty interest of any Indian under the jurisdiction of the Tribes in such trust oil and gas.

Subsequent amendments to the Ordinance have changed the reporting/payment periods (June 25, 1980) and have raised the tax from .5% to 4% (March 10, 1982). General counsel for each of the Tribes contacted the U.S. Department of Interior regarding approval of the Ordinance. In response, a letter dated November 19, 1980, signed by the Deputy Assistant Secretary—Indian Affairs, stated in part:

> The ordinance does not by its terms require the Department's approval, and neither the Shoshone Tribe nor the Arapahoe Tribe has adopted a constitution requiring that the Department approve or review its ordinances. The Department's power to approve ordinances of Indian tribes must, in our view, be authorized either by an act of Congress, or by a tribal constitution or legislative act. Accordingly, we will not consider the ordinance for approval.
>
> We emphasize, however, that the validity of tribal ordinances does not depend upon prior approval by this Department ... Enactment of tribal ordinances without Secretarial approval, except where that approval is required by statute, a tribal constitution, or a tribal ordinance, is an exercise of 'inherent powers of a limited sovereignty which has never been extinguished.' Felix Cohen, *Handbook of Federal Indian Law,* 122 (1941).
>
> We also believe that Indian tribes possess authority to enact ordinances taxing the activities of non-Indians doing business on their reservations.

Civil Action No. 80–181 was filed June 23, 1980 naming as plaintiffs seven oil companies, and naming as defendants the Tribes, individual members of the Business Councils and the Secretary of the Interior. Two additional oil companies were allowed to intervene. Civil Action No. 80–208 was filed on July 5, 1980 naming as plaintiff Amoco Production Company and naming as defendants the individual members of the Business Councils and the Secretary of the Interior. The Tribes were permitted to intervene.

The Tribes have counterclaimed asking this court to order report of production and payment of taxes. On May 7, 1982 the court ordered the plaintiff companies to

deposit with the Clerk of Court all taxes due under Ordinance 39, to be held in escrow and invested pending the outcome of this litigation. The defendants have also filed a motion for summary judgment, which motion was heard on April 30, 1982 and taken under advisement. Since that time the case has been reassigned from Judge Brimmer to Judge Kerr and subsequent thereto defendants have filed a supplemental memorandum in support of their summary judgment motion. Plaintiffs in C80–181 have also filed a motion for summary judgment, supported by their original memoranda in opposition to defendants' summary judgment motion and additional memoranda has subsequently been filed. Amoco has not filed a motion for summary judgment.

Previously, defendants had also filed a motion to dismiss for lack of jurisdiction. The motion has been withdrawn so that the court may proceed on the merits of these cases.

On July 25, 1983 plaintiffs and plaintiff-intervenors named in C80–181 filed an amended complaint alleging five causes of action; Amoco in C80–208 filed a second amended complaint involving fourteen counts.

### Contentions of Plaintiffs

Relying heavily on two district court cases (one from the District of Utah and one from the District of Arizona), plaintiffs' primary contention is that the decision of the United States Supreme Court in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) is not applicable to the tax in this case, that said decision did not decide the question of Secretary approval of this type of tax, and that approval of the Secretary *is* required to validate the ordinance in question here. More specifically, supported by the decision in *Southland Royalty Co.; Phillips Petroleum Co., et al.; Superior Oil Co., et al.; Texaco, Inc., et al. v. Navajo Tribe of Indians, et al.*, Case No. C79–0140, C79–0153, C79–0237, C79–0296 (District of Utah, Central Division, June 5, 1980) (hereinafter referred to as *Southland*), plaintiffs allege that the Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–g gave regulatory authority over reservation oil and gas to the Secretary of the Interior. The tribes can recover the authority; however, under this plan, in order to do so they must organize under the Indian Reorganization Act, 25 U.S.C. § 461, et seq. (IRA) and adopt a constitution which is subject to Secretary of the Interior approval. Amoco contends that "[a]doption of the challenged ordinance without the approval of the Secretary of Interior is an unwarranted intrusion on the liberties of the plaintiffs guaranteed by the United States Constitution." Memorandum of Amoco Production Co. in Opposition to Defendants' Motion to Dismiss and Motion for Summary Judgment on Plaintiffs' Claims, p. 8 (filed April 23, 1982). It appears that plaintiffs view the above-detailed plan as the only effective method of constraint on the Tribes, and allege that without such constraint the Tribes would be left with unlimited power subject to great abuse. Amoco further argues that there is a violation of the commerce clause and that factual questions remain regarding that issue.

Since the positions set forth in this case and the disposition thereof rely so heavily on a few cases, the court here takes the opportunity to briefly summarize the relevant portions of those cases.

### Southland

One case upon which plaintiffs rely so heavily is the *Southland* case (cited *supra*) from the District of Utah, Central Division. The case involves the challenge of tribal taxes on the value of lease interests and on gross receipts of certain on-reservation business activities. The defendants include the Navajo Tribal Council, the Navajo Tax Commission, tribal officers and various state and federal agency officers.

The Navajo Tribe is not organized under the IRA and has not adopted a charter and constitution. The Tribal Council was created by the Interior Department and is now recognized as the governing body of the Tribe. The Tribal Resolution imposing the

taxes was not approved by the Secretary of the Interior.

The court in *Southland* proposes that if tribal resolutions are allowed to govern without Secretarial approval, there would be no incentive for adoption of a constitution which would limit self-government by requiring said approval. The court adopts the position proposed by plaintiffs in the present case that the Mineral Leasing Act gave comprehensive regulatory authority to the Secretary, to be regained by the tribes only after adoption of a tribal constitution. The court goes on to explain that the Secretary should have the opportunity to examine tribal regulations "to determine their impact on the very regulatory system he is charged with administering." *Southland, supra* at 15.

While the court concedes that there is no express statutory language requiring Secretarial approval of tax resolutions, it concludes that congressional intent for such approval can be inferred from (1) the delegation of regulatory authority over reservation leases to the Secretary (allegedly through the Mineral Leasing Act); (2) required Secretarial approval for tribal constitutions; and, (3) the historical relationship between the Interior Department and the Navajo Tribe as evidenced by the Interior Department's creation of the Tribal Council. The court, therefore, makes a determination as a matter of law that Secretarial approval is a precondition to ordinance validity. [NOTE: Since this case has been submitted, and since work on this opinion has begun, the Tenth Circuit Court of Appeals has reversed the portion of the *Southland* case that conditioned validity of the tribal taxes on approval of the Secretary of the Interior. *Southland Royalty Co., et al. v. Navajo Tribe of Indians, et al.,* 715 F.2d 486 (10th Cir.1983). The decision and reasoning of the Tenth Circuit strongly supports the result in the present case.]

### Kerr-McGee

Plaintiffs also rely on *Kerr-McGee Corp. v. Navajo Tribe of Indians, et al.,* No. Civ. 80–247 Phx. WPC (District of Arizona, June 29, 1982). This case by its own account is nearly identical to *Southland.* After the *Southland* decision, the court in *Kerr-McGee* stayed proceedings until the United States Supreme Court's disposition of *Merrion.*

The court first determines that collateral estoppel is appropriate as *Southland* was dispositive of the issue. In making this determination, the court found that the *Merrion* decision handed down by the United States Supreme Court did not make a significant change in the law that was not already in existence pursuant to the Tenth Circuit *Merrion* decision. Furthermore, it notes that the issue of Secretarial approval was only indirectly dealt with in the *Merrion* decision and contends that the peripheral treatment of that issue supports the *Southland* decision.

The court goes on to address the question on its merits (assuming collateral estoppel does not apply), and reaches the same result—judgment in favor of plaintiffs. In short, the court found Secretarial approval necessary for the same reasons as those set forth in *Southland.*

[NOTE: The Navajo Tribe appealed the *Kerr-McGee* case to the Ninth Circuit Court of Appeals. It was argued March, 1983 and as of yet no decision has been rendered. However, in light of the Tenth Circuit decision in *Southland,* the basis of the court's decision in *Kerr-McGee* is weakened and provides poor precedent on the issue of ordinance validity without Secretarial approval.]

### Babbitt Ford

The Ninth Circuit Court of Appeals, to which the *Kerr-McGee* case has been appealed recently, rendered a decision in a case involving tribal sovereign power to enact and enforce vehicle repossession regulations. The case consolidates appeals in two cases, *Babbitt Ford, Inc. v. Navajo Indian Tribe and Tom and Lorraine Sellers; Gurley Motor Co. v. Peter McDonald,* 710 F.2d 587 (9th Cir.1983). Defendants in the present case contend that *Babbitt Ford* contains law applicable to the question raised

in *Kerr-McGee* and the present case, and that such law favors defendants' position. The issue in *Babbitt Ford* that is relevant to the case at hand is whether the Navajo Tribe could exercise tribal authority over non-Indians without a constitution or reorganization under the IRA.

The Ninth Circuit first determines that the Tribe retains inherent sovereign power as well as the power to exclude. One or both of these powers provides the authority to exercise civil jurisdiction. The court then reviews whether or not the authority has been divested and concludes (1) divestiture did not occur by treaty (silence does not remove rights but rather those powers not specifically removed are retained by the Tribe); and, (2) divestiture did not occur based on the Tribe's dependent status (there was no conflict between that dependent status and the independent freedom that the Tribe retains to regulate its own affairs). Finally, the Ninth Circuit Court found that there were sufficient constraints on the exercise of tribal authority to conclude that the authority was not inconsistent with the overriding interests of the national government, and that the language of *Merrion* which finds that the IRA is congressional action preempting judicial review of state tax, does not require that tribes have a constitution before they can validly exercise civil jurisdiction.

### Merrion

While much of the *Merrion* case has been previously discussed, this will provide a more complete picture of how the case has resolved issues on point with those raised here. The *Merrion* case involves the Jicarilla Apache Tribe which is organized under the IRA. Pursuant to that Act, the Tribe adopted its own constitution preserving all powers conferred by the IRA. A revision of the constitution in 1968 vested the Tribe's inherent powers in the tribal council, subject to the restrictions set forth in the constitution itself. The revision further required that ordinances to impose tax on non-Indians would be subject to Secretarial approval. Thereafter, the Tribe adopted an

ordinance imposing a severance tax on oil and gas production on reservation land. *As required by the Tribal Constitution,* the ordinance was approved by the Secretary of Interior. A challenge of the tribal authority to tax non-Indians in this situation brought the case to the United States Supreme Court.

The Court discusses tribal power to tax and concludes that it stems from Indian sovereignty and not from the power to exclude. The discussion of Indian taxing power is thorough and well supported by historical analysis. The Court specifically reaches the conclusions that (1) the taxing power is inherent; (2) it is necessary to tribal self-government and territorial management; and (3) that necessary constraints exist to insure that improper exercise of the authority will not occur.

The Court goes on to note that even if the tax were imposed pursuant to the tribal power to exclude, it would still be valid.

When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its *ultimate* power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry. However, it does not follow that the lawful property right to be on Indian land also immunizes the non-Indian from the tribe's exercise of its lesser-included power to tax or to place other conditions on the non-Indian's conduct or continued presence on the reservation. A nonmember who enters the jurisdiction of the tribe remains subject to the risk that the tribe will later exercise its *sovereign power.* (footnotes omitted) *Merrion, supra* 455 U.S. at 144–145, 102 S.Ct. at 905.

In very definite terms, the Court finds that whether exercised as the power to exclude or merely sovereign power, the tribal authority to tax exists, and remains intact unless surrendered in "clear and unmistakeable" terms. *Id.* at 148, 102 S.Ct. at 907. Logically, the second step of analysis involves a determination of whether that power has been surrendered. The Court finds that the Indian power to tax has not

been traded to the states for royalty interests and that there is no evidence of conflict with a national energy policy. Upon consideration of the Mineral Leasing Act of 1938, the Court rejects the argument that the Act deprived tribes of their authority to tax and concluded that Indian taxing power had not been taken away as of the time of *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). The Court further notes that an ambiguity as to whether the taxing power has been surrendered or not is resolved in favor of the Tribe.

Finally, the Court in *Merrion* considers whether the tax imposed violates the commerce clause. The Court resolves this issue by reliance on the principle that judicial review of taxes under the commerce clause is only proper "when Congress has not acted or purported to act." *Merrion, supra* 455 U.S. at 154, 102 S.Ct. at 910. Congress *had* acted in the *Merrion* case since the IRA was applicable and provided the necessary "federal checkpoints" to effectuate the tax. However, in its comprehensive treatment of the case, the Court goes on to find that even if judicial scrutiny were proper, the tax in question could survive in accordance with the requirements of *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

The Court in *Merrion* determined that the Tribe had inherent sovereign authority to tax, that the authority had not been lost or surrendered, and that the tax was not rendered invalid on commerce clause grounds. The decision provides the basis for the finding by this court that the severance tax imposed by the Shoshone and Arapahoe Tribes pursuant to Ordinance 39 is valid.

## THE VALIDITY OF SHOSHONE/ARAPAHOE ORDINANCE 39

### Power Of Tribes To Tax

In light of the previously cited cases, there seems to be little need to discuss whether the Tribes in this case have the inherent sovereign authority to tax. Based upon the decisions in *Merrion* and *Colville*, supported by many other cases and authorities cited therein, this court concludes that tribal taxation is an inherent right and that the Shoshone and Arapahoe Tribes on the Wind River Indian Reservation have full authority to exercise that right.

### Restrictions On Tribal Power

Again, following the analysis set forth in the *Merrion* case, the second step is to determine if that authority has been surrendered or otherwise restricted. The *Merrion* Court rejected the argument that the Mineral Leasing Act deprived the tribes of regulatory rights, subject to adoption of a constitution with the requirement of Secretarial approval. See *Merrion, supra* 455 U.S. at 149–152, 102 S.Ct. at 907–909. With that element resolved, the remainder of plaintiffs' argument involves (1) lack of constraint on the Tribes; and, (2) the contention that tribes would not be encouraged (and congressional encouragement is clear) to organize under the IRA and adopt constitutions if such reorganization only served to restrict power they already had.

In *Merrion,* one of the constraints noted by the Court *was* the requirement for Secretarial approval. However, that requirement was self-imposed by the Tribe and the case does *not* hold that all tribal taxes on mineral production must be subject to Secretarial approval. This court finds that sufficient constraints exist on the Shoshone and Arapahoe Tribes to secure fair and reasonable application of the tax. Congress has ultimate power to take away tribal authority to tax and the Indian Civil Rights Act imposes constitutional protections on those under tribal jurisdiction. *Merrion, supra; see also Babbitt Ford, supra* at p. 599; PEVAR, THE RIGHTS OF INDIANS AND TRIBES, pp. 217–220 (1983). Furthermore, this court finds plausible the argument that economic and political restraints prevent the Tribes from total arbitrary "confiscation," and this case itself is evidence that challenge to the tax is possible.

The final consideration in this second step of determining the validity of Ordinance 39 and the tax it imposes involves the IRA, organization thereunder, and tribal constitutions requiring Secretarial approval to validate ordinances and resolutions. Plaintiffs argue, why would any tribe organize under the IRA and impose upon themselves the constraint of Secretarial approval when non-organized tribes are free to impose taxes subject only to their own tribal requirements? The answer is that there were other benefits available under reorganization. The benefits included addition of land to reservations, creation of new reservations, restoration of tribal ownership, federal loans and preference for Indian employees in the Bureau of Indian Affairs. In fact, while constitutions were encouraged under the IRA, they were not required. *See* 25 U.S.C. §§ 461 et seq.; THE RIGHTS OF INDIANS AND TRIBES, *supra* at 5–6. Therefore, it was not simply a choice between reorganization adding the restraint of Secretarial approval and non-organization with free tribal reign. Many other factors were involved. Furthermore, the IRA made it possible for tribes to choose the type of government they wanted. *See* 25 U.S.C. §§ 476 et seq.; *Southland* (10th Cir.) *supra* at p. 8. Constitutions were optional; imposing Secretarial approval was optional. This source of governing authority was optional because the tribes already had and continue to have much of the authority specified by those measures. "[N]either the Tribes' Constitution nor the Federal Constitution is the font of any sovereign power of the Indian tribes." *Merrion, supra* 455 U.S. at 149, n. 14, 102 S.Ct. at 907, n. 14.

The ability of the Shoshone and Arapahoe Tribes to validly impose this tax is further supported by the cases of *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) and *Knight v. Shoshone and Arapahoe Indian Tribes*, 670 F.2d 900 (10th Cir.1982). Both cases involve the same Shoshone and Arapahoe Tribes present in this case and strongly support the application of the previously discussed law. *Mazurie* provides that there is independent authority of Indian tribes over matters that affect their internal and social relations. *Knight* involves a tribal zoning ordinance and contains abundant language in support of tribal authority to control use of reservation land (even non-Indian land) without delegation of the power by Congress and without Secretarial approval. Both cases leave little doubt that the Shoshone and Arapahoe Tribes have inherent sovereign power to regulate their internal and social affairs with an ordinance such as the one in question, with or without approval of the Secretary of the Interior. *Knight,* citing the *Merrion* case together with historical opinions from the United States Attorney General sums up the present law:

> The executive branch expressly advised the Tribes that the ordinance could be enacted without BIA approval. Similarly, in 1900 the United States Attorney General advised the Secretary of Interior that certain tribes there considered could 'prescribe the terms . . . upon which they will permit outsiders to reside or carry on business in their territory.' 23 Op.Atty. Gen. 214, 216 (1900). See also opinion of Solicitor of the U.S. Interior Department quoted in *Merrion v. Jicarilla Apache Tribe,* 455 U.S. at 146, n. 12, 102 S.Ct. at 906, n. 12, 42 CCH S.Ct. Bull., p. 1134, n. 12. The power to control use of non-Indian owned land located within the reservation flows from the inherent sovereign rights of self-government and territorial management. See *Merrion v. Jicarilla,* Id. 455 U.S. at 130, 137, 102 S.Ct. at 894, 901, 42 CCH S.Ct. Bull. at pp. 1121, 1125.

*Knight, supra* at 903.

### Commerce Clause

As noted earlier, the courts are only allowed to scrutinize the validity of a tax as it relates to the commerce clause when Congress has not acted to provide the necessary balance. In *Merrion* the appropriate balance was determined by Congress and imposed in the form of the IRA. Since the IRA does not apply here, this court must look to the standards for judicial scrutiny of such a tax, set forth in *Brady, supra.* A tax has been sustained against commerce clause

challenge when (1) the tax is applied to an activity with a substantial nexus with the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and, (4) is fairly related to the services provided by the state. *Brady, supra* 430 U.S. at 279, 97 S.Ct. at 1079. In *Merrion* the Court implied that when the activities taxed occurred entirely on reservation land, there was little basis for challenge to the first and second requirements set forth by *Brady.* In fact, plaintiffs do not question the tax on these grounds.

■ Plaintiffs do contend that the tax discriminates against interstate commerce. However, Ordinance 39 applies to "all oil and natural gas produced, saved and sold or transported from the field where produced ....", not distinguishing between those minerals removed from and those remaining on the Reservation. There is no preferential treatment specified for those minerals that remain on the Reservation. Even language such as "sold or transported off the Reservation" was held in *Merrion* to apply in such a way that the tax did not discriminate against interstate commerce. Furthermore, viewing the exemptions specifically, this court, supported by *Merrion* finds that the Tribes do not have to go through the paces of taxing themselves, and that the royalty interests of individual members should remain exempt as direct income from trust lands. *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). It remains a choice made by the tribes regarding the subject of their taxes.

Finally, Amoco contends that there is a question of fact regarding whether the tax is fairly related to the services and benefits rendered. There is no question that the plaintiffs benefit from the privilege of removing oil and gas from tribal lands and that the privilege depletes tribal resources. The United States Supreme Court in *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) upholding a Montana severance tax that in some instances amounted to 30% of the contract sales value of minerals produced, held that it was not necessary to establish factually the relationship between the amount of tax Montana received and the value of the services provided. The "general advantages of a civilized society" and the privilege which depleted state resources provided sufficient justification for the tax. The same justifications are present here.

*Conclusion*

In short, it appears that sufficient undisputed facts exist to support the findings necessary for resolution of these cases: (1) The Shoshone and Arapahoe Tribes have sovereign authority to impose a tax on the oil and gas produced from Reservation land; (2) neither the Mineral Leasing Act of 1938 nor any other legislation has removed that sovereign authority. Absent clear intent on the part of the Congress to restrain tribal rights, those rights remain intact, and the authority of the Shoshone and Arapahoe Tribes remains intact; and, (3) the tax imposed pursuant to Ordinance 39 does not discriminate against interstate commerce and is fairly related to the services provided by the Tribes. Judicial review of the tax in relation to the commerce clause results in a determination that no violation of the commerce clause occurs and the tax cannot be invalidated on those grounds.

Summary Judgment will be entered in accordance with this Memorandum Opinion.