**MUSTANG FUEL CORPORATION, et al., Plaintiffs,**

v.

**Viola HATCH, et al., Defendants.**

**WARD PETROLEUM CORPORATION, Plaintiff,**

v.

**Juanita LEARNED, et al., Defendants.**

Nos. CIV–88–1801–A, CIV–88–1954–A.

United States District Court,
W.D. Oklahoma.

July 5, 1995.

As Amended and Reissued
Nunc Pro Tunc July 18, 1995.

Stanley L. Cunningham, Steven W. Bugg, McAfee & Taft, Oklahoma City, OK, for Mustang Production Co., Amoco Production Co., Anson Corp., Apache Corp., Conoco Inc., Phillips Petroleum Co., Sun Exploration and Production, Mesa Midcontinent Ltd. Partnership, Texaco Inc., Texaco Producing Inc., Union Oil Co. of California, NGC Energy Co., Bogert Oil Co., Kaiser Francis Oil Co., Seneca Oil Co., Unit Drilling and Exploration Co., Viersen & Cochran, Mustang Fuel Corp., Oryx Energy Co., Mesa Midcontinent Co., Texaco Exploration & Production Inc., PG & E Resources Co., Louis Dreyfus Nat. Gas Corp., Unit Petroleum Co., Bracken En-

ergy Corp., Santa Fe Minerals, Inc., Kenneth W. Cory.

James R. Winnie, Oklahoma City, OK, for Juanita Learned, Edgar Heap-of-Birds, Floyd Blackbear, Jonathan Burgess, Christine George, Kris Littleraven, Marlin Hawk.

James R. Winnie, Melody L. McCoy, Yvonne T. Knight, Boulder, CO, for Alton Harrison, Viola Hatch.

Melody L. McCoy, Yvonne T. Knight, Boulder, CO, for Charles Surveyer, Archie Hoffman, Robert Tabor, Glen Starr, Sr., Eddie Wilson, Leslie Medicine Bear, John Fletcher, Sr., Barbara Koebrick, Ruby Standingwater, Millicent Youngbear.

Bradley S. Bridgewater, US Dept. of Justice, Denver, CO, for U.S.

Michael E. Smith, Barnes Smith & Lewis, Oklahoma City, OK, for Ward Petroleum Corp.

## *ORDER*

ALLEY, District Judge.

Before the Court are cross-motions for summary judgment filed by all parties in these consolidated cases. The parties seek a ruling on the validity of a tax law enacted by the Cheyenne–Arapaho Tribes of Oklahoma (the "Tribes") in 1988 that imposes a severance tax on all oil and gas produced from lands within the Tribes' territorial jurisdiction. The principal issue is: what is that territorial jurisdiction?

Plaintiffs do not question the Tribes' power to levy the tax or to levy it on production from tribal lands, that is, lands held in trust for the Tribes by the United States. Plaintiffs claim, however, that the Tribes have exceeded the bounds of their powers by taxing production of oil and gas from allotted lands, that is, lands held in trust for individual members of the Tribes. In addition, Ward Petroleum Corporation, plaintiff in No. CIV–88–1954–A, asserts that the tax violates the Commerce Clause of the United States Constitution.

## *PROCEDURAL HISTORY*

These cases were filed in 1988 by numerous oil companies and an individual who hold oil and gas leases or operate wells in drilling and spacing units that include allotted lands. The defendants are members of governmental bodies of the Tribes responsible for enacting and enforcing the tax law, the Business Committee and the Tax Commission. The United States appears as *amicus curiae* in support of the Tribes.

Both cases were stayed in 1989 to permit the plaintiffs to exhaust their tribal remedies. *See National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 856–57, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985). Plaintiffs first pursued administrative remedies before the Cheyenne–Arapaho Tax Commission and then sought declaratory and injunctive relief from the Cheyenne–Arapaho District Court. In January 1991, the district court granted summary judgment to the Tribes, and an appeal was taken to the Cheyenne–Arapaho Supreme Court. The supreme court affirmed the district court's decision in a published opinion filed January 3, 1994.

The cases before this Court were reopened in February 1994. Plaintiffs moved for summary judgment in October 1994 and defendants followed in November 1994. The parties reurge the same evidence and arguments that they presented to the tribal courts, except Ward, which raises its constitutional challenge only in this forum and relies on a new affidavit. The Court has denied a motion by defendants to exclude Ward's new claim and will decide the Commerce Clause claim on its merits.

## *UNDISPUTED FACTS*

The relevant facts are primarily historical ones. The following recitation draws heavily from the Cheyenne–Arapaho Supreme Court's opinion. *See also Cheyenne–Arapaho Tribes v. Oklahoma,* 618 F.2d 665, 666 (10th Cir.1980).

The Tribes were relocated to Oklahoma from their traditional homelands through two treaties with the United States. The first treaty in 1865 set aside a reservation in an area located partly in Kansas and partly in Oklahoma. When it was ratified, Congress required that the treaty be amended to lo-

cate the reservation solely in Oklahoma. Thus, a second treaty in 1867 defined a reservation located wholly in Oklahoma north of the Cimmarron River. The Tribes apparently misunderstood the location of their 1867 reservation and never occupied it; they located farther south. When the mistake was discovered, an executive order in 1869 conformed the boundaries of the Tribes' reservation to the territory they actually occupied. The allotted lands at issue here lie within the reservation specified in the 1869 executive order.

In 1887, a federal policy shift toward assimilation resulted in passage of the General Allotment (or Dawes) Act, 24 Stat. 388. *See* 25 U.S.C. §§ 331–58. This act authorized negotiations with tribes designed to terminate their reservations, to allot lands to individual tribal members, and to purchase the "surplus lands" for non-Indian settlement. In 1889, the Jerome Commission was created to conduct these negotiations, and in 1890, it negotiated an Allotment and Cession Agreement with the Cheyenne–Arapaho. This Agreement was ratified by Act of March 3, 1891, 26 Stat. 989, 1022.

Through the Agreement, the Tribes ceded absolutely their interest in the reservation defined by the 1867 treaty (which they never inhabited). The Tribes ceded "[s]ubject to the allotment of land in severalty to the individual members of the Cheyenne and Arapaho tribes of Indians, as hereinafter provided for and subject to the conditions hereinafter imposed" their interest in the reservation defined by the 1869 executive order. The ensuing provisions of the Agreement gave all tribal members a right to select allotments "[o]ut of the lands" within the 1869 reservation. The statutory scheme under the Dawes Act was that allotments were to be held in trust by the United States for 25 years and then conveyed to the allottees or their heirs in fee simple. However, all allotted lands at issue here have been held in trust continuously and were never conveyed.

By 1892, all allotments required by the Agreement had been made and approved. On April 19, 1892, the remainder of the Tribes' 1869 reservation lands, except those claimed by other tribes and those reserved for certain uses under the Agreement, were opened to non-Indian settlement by presidential proclamation.

As is well known, the United States later reversed its assimilation policy. Beginning in 1930, statutes were enacted to reorganize tribal governments and regain communal land. Tribes located in Oklahoma were excluded from the Indian Reorganization Act of 1934, which specifically addressed tribes' governmental powers. *See* 25 U.S.C. §§ 461–79. However, Oklahoma tribes were included under the Oklahoma Indian Welfare Act of 1936. *See* 25 U.S.C. §§ 501–09. Consequently, the Cheyenne–Arapaho Tribes have now reacquired lands within the boundaries of the 1869 reservation. These tribal lands are also held in trust by the United States and, as noted above, tribal taxing power as to tribal lands is not at issue in this case.

Before 1929, the Tribes had a government comprising traditional chiefs. In 1929, they adopted a written constitution and established an elected, representative form of government. Under the Oklahoma Indian Welfare Act, the Tribes adopted a new tribal constitution in 1937; that constitution was replaced with the current Cheyenne–Arapaho Constitution approved by the Secretary of the Interior in 1974. Thus, the Tribes have continuously maintained a tribal government and been federally-recognized.

In 1988, the Tribes enacted the General Revenue and Taxation Act, Ordinance No. 8118033. This act created a Tax Commission and, among other things, provided for the levy and collection of taxes in order to generate revenue for tribal services. *Id.* §§ 2, 101. Use of tax revenues was restricted to essential services, including police and fire protection, tribal courts, roads, water and waste disposal, education, public health, economic development, acquisition of land and administration of Indian property. *Id.* § 3. The new law created a tobacco tax (§§ 202–03), a sales tax (§ 302), a tribal entertainment tax (§ 502), and the oil and gas severance tax at issue.

A severance tax equal to 7.085% of the gross market value was levied on all petroleum, gas and other hydrocarbons "produced, severed, saved, and removed from any land within the jurisdiction of the Cheyenne–Arapaho Tribes of Oklahoma." *Id.*, §§ 401–02. The Tax Commission later promulgated rules defining that jurisdiction territorially to include all "Indian country" as defined by 18 U.S.C. § 1151 within the boundaries of the 1869 reservation. The incidence of the tax was imposed on mineral lessees and their successors, who are required to file reports and remit taxes monthly; these obligations can be assumed by unit operators and purchasers with the Tax Commission's approval. Specifically excluded from the tax law is "production attributable to the Indian trust royalty interest, not to exceed 20% of the gross value of such production, of all individually owned and tribally owned lands.... [P]ursuant to federal law and tribal constitution, no taxes shall be due or imposed on that portion of the production attributable to the Indian royalty interest." Ordinance No. 8118033, § 415.

### DECISION OF THE CHEYENNE–ARAPAHO SUPREME COURT

As noted above, the Cheyenne–Arapaho Supreme Court affirmed the lower court's ruling that the Tribes' territorial jurisdiction encompasses all allotted lands. In so doing, the supreme court concluded that the contention on which plaintiffs base their challenge—that the 1890 Cession and Allotment Agreement disestablished the 1869 reservation—was immaterial. Rather, the Cheyenne–Arapaho Supreme Court applied a test formulated by the United States Supreme Court for determining whether land is subject to tribal jurisdiction: "whether it has been 'validly set aside for the use of the Indians' and is subject to federal protection." Slip op. at 16 (quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe*, 498 U.S. 505, 511, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991)). Under that test, the Cheyenne–Arapaho Supreme Court said, the allotted lands still held in trust for tribal members "are Indian country under 18 U.S.C. § 1151(c) and, as such, are validly set aside for the use of Indians under federal protection." *Id.* at 17.

The Cheyenne–Arapaho Supreme Court noted that its tribal government has continuously exercised authority over allotted lands and other lands within the boundaries of the 1869 reservation. According to the supreme court, nothing in the 1865 or 1867 treaties, the 1869 executive order or the 1890 Cession and Allotment Agreement, divested the Tribes of governmental authority. The 1890 Agreement changed the way title to the land was held, the supreme court reasoned, but did not divest the Tribes of governmental power or jurisdiction over its entire reservation, particularly lands that remained in federally protected status. Accordingly, the supreme court concluded that allotted lands still in trust are indistinguishable from other tribal lands for purposes of tribal jurisdiction, including the Tribes' inherent power to tax the activities of those who exercise the substantial privilege of doing business on and taking valuable resources from those lands.

### STANDARD OF REVIEW

■ On the pivotal issue of whether the Tribes have jurisdiction over non-Indian oil and gas operations on allotted lands, plaintiffs essentially seek relief from an adverse tribal court decision. Thus, a preliminary question is: what standard of review should be applied to the tribal court's ruling? Plaintiffs contend that this Court should defer to the tribal court's findings of fact but must review *de novo* its conclusions of law. Defendants argue that even legal conclusions of the Cheyenne–Arapaho Supreme Court should receive some deference. Defendants assert that tribal courts have special expertise in Indian law and are best suited to determine what was intended by treaties and agreements made by their tribal leaders. Lacking legal authority for this argument, however, defendants do not articulate a standard of review based on Indian law precedents but instead refer by analogy to cases involving decisions by federal administrative agencies.

The Court finds defendants' analogy to be inapposite here. The tribal court, unlike an

administrative agency, is part of a tribal government with a vested interest in the outcome of this case; millions of tax dollars now lie in escrow pending entry of judgment. Moreover, while tribal courts undoubtedly have expertise in many matters, including application of tribal laws and precedents, the issue presented in this case requires examination of federal precedents and historical events involving the federal government as well as the Tribes. The Supreme Court has stated: "The question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court [and, presumably, a tax commission] is one that must be answered by reference to federal law and is a 'federal question'. . . ." *National Farmers*, 471 U.S. at 857, 105 S.Ct. at 2452. Therefore, federal courts are equally capable to decide the jurisdictional issue presented as are tribal courts.

However, plaintiffs wrongly argue that the Cheyenne–Arapaho Supreme Court's opinion may be disregarded altogether. The tribal court's decision rests on important facts, namely, that the Tribes continuously had some form of government and that their government remained functional even when the Tribes briefly had no communally-owned land base. In view of these factual underpinnings, the Court finds the tribal court's ruling to be helpful in the disposition of this case.

## DISCUSSION

### I.

#### Disestablishment

Plaintiffs' primary contention is that the Tribes cannot tax non-Indian activities on allotted lands because the 1890 Cession and Allotment Agreement disestablished the Tribes' reservation and thus destroyed any territorial jurisdiction over which the Tribes could exercise authority. Once disestablished, plaintiffs say, the Tribes' power to govern allotted lands could only be restored by Congress, and no such restorative legislation has ever been enacted for the Cheyenne–Arapaho Tribes of Oklahoma.

Defendants, on the other hand, claim the Tribes have inherent authority to tax economic activities on all lands validly set aside for Indian use, including lands continuously held in trust for tribal members. Defendants contend that abolishment of tribal government cannot be read into the 1890 Agreement because only a clearly expressed divestiture of tribal authority can affect a tribe's sovereignty and its inherent power to tax. Defendants forcefully argue that tribal jurisdiction remains undiminished by disestablishment of reservation boundaries because the remaining checkerboard of allotted lands provides a viable geographic base or "adequate fulcrum for tribal affairs". *DeCoteau v. District County Court*, 420 U.S. 425, 446, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975).

There is ample case law concerning tribal jurisdiction to tax activities occurring within reservation boundaries and concerning state jurisdiction to tax Indian lands. There is sparse legal authority, however, concerning a tribe's power to tax non-Indian activities on allotted lands existing without a reservation. Plaintiffs resort to the principle that a tribe only has jurisdiction over nonmembers within its territory. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141–42, 102 S.Ct. 894, 903–04, 71 L.Ed.2d 21 (1982) ("[T]he limited authority that a tribe may exercise over nonmembers does not arise until the nonmember enters the tribal jurisdiction."). Plaintiffs also rely on *United States v. Oklahoma Gas & Elec. Co.*, 318 U.S. 206, 63 S.Ct. 534, 87 L.Ed. 716 (1943), to argue that disestablishment of a reservation divests a tribe of governmental power over allotted lands.

In *Oklahoma Gas & Elec.*, however, the Supreme Court was applying a statute that required the Secretary of Interior's permission before rights-of-way through public lands, parks and reservations could be used for electrical lines. *Id.* at 211–12, 63 S.Ct. at 536–37. The Court decided that, when a reservation had been disestablished, the resulting allotted lands no longer could be considered a reservation, and the Secretary's approval was not required in order to erect power lines running through those allotted lands. *Id.* at 215–16, 63 S.Ct. at 538–39. Disestablishment was critical because the

statute involved gave the Secretary of Interior approval or disapproval authority only over "reservations" and thus existence of a reservation was necessary.[1]

In contrast, disestablishment of a tribe's reservation has repeatedly been declared a "non-issue", as defendants say, in cases concerning state jurisdiction to tax tribal members. *See, e.g., Oklahoma Tax Comm'n v. Sac & Fox Nation,* 508 U.S. ——–——, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30, 40 (1993) (tribal members living and working on allotted lands are immune from state income and vehicle registration taxes). Plaintiffs assert that the Supreme Court's analysis in *Sac & Fox* is not controlling here, where a tribe's, rather than a state's, civil jurisdiction is at issue. The Court disagrees. The issue is analogous—whether one government can tax citizens of another government engaging in activities on allotted lands. Here, as in *Sac & Fox,* disestablishment of the tribal sovereign's reservation should not be dispositive. Rather, the proper test should be one by which jurisdictional disputes between Indians and non-Indians traditionally have been resolved.[2]

In cases concerning tribal immunity from state taxes, the test consistently applied by the United States Supreme Court is whether the lands on which a state seeks to exercise jurisdiction over a tribe are lands validly set apart for Indian use under supervision of the federal government. *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe,* 498 U.S. 505, 511, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991). Under this test, as discussed below, it is clear that the allotted lands in question are "Indian country". *See Sac & Fox,* 508 U.S. at ——–——, 113 S.Ct.

at 1991, 124 L.Ed.2d at 40–41; 18 U.S.C. § 1151(c). In cases concerning the validity of a tribal tax, the test applied by the Supreme Court is whether the tribe has inherent power to tax the non-Indian activities in question. *See Merrion,* 455 U.S. at 140–41, 102 S.Ct. at 903–04. Under this test, too, the Cheyenne–Arapaho Tribes of Oklahoma clearly had authority to enact and enforce the severance tax at issue.

## II.

### *Indian Country*

Plaintiffs do not, and indeed cannot on the facts presented, contest that the allotted lands involved have been validly set apart for Indian use. These allotted lands have continuously been held in trust by the United States for the benefit of tribal members. Rather, plaintiffs take issue with the Tribes' reliance on 18 U.S.C. § 1151(c), a criminal statute, to define the bounds of their civil jurisdiction. Plaintiffs also argue that the allotted lands are set apart for individual members of the Tribes, not the Tribes themselves, and thus the Tribes have no interest in those lands.

Section 1151's definition of "Indian country" has been frequently used by federal courts and Congress to define the parameters of tribal jurisdiction in both civil and criminal matters. *See, e.g., DeCoteau,* 420 U.S. at 427 n. 2, 95 S.Ct. at 1084 n. 2 (citing cases); *Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531, 1540–41 (10th Cir.1995) (citing cases); 25 U.S.C. § 1903(10). This Court is bound by the Tenth Circuit's recent holding in *Watchman:* "We hold § 1151 represents an express Con-

1. Plaintiff Ward relies on *Tooisgah v. United States,* 186 F.2d 93 (10th Cir.1950), rather than *Oklahoma Gas & Elec.,* for its disestablishment argument. However, *Tooisgah* also involved jurisdiction under a statute containing the phrase, "within any Indian reservation". *See* 186 F.2d at 99; *United States v. Burnett,* 777 F.2d 593, 596 (10th Cir.1985).

2. Our court of appeals has explained the usefulness of the disestablishment analysis as follows:
   The State seems to believe that the Indian country status of the [land at issue] rests on whether exterior boundaries of the 1866 Creek reservation have been disestablished. It does

not.... The disestablishment question is primarily important for determining the status of *non-Indian* lands, which remain Indian country under 18 U.S.C. § 1151(a) until the surrounding portion of a reservation is disestablished. Tribal lands, trust lands, and certain allotted lands generally remain Indian country despite disestablishment. *See, e.g., Solem [v. Bartlett],* 465 U.S. [463] at 467, n. 8, 104 S.Ct. [1161] at 1164, n. 8 [79 L.Ed.2d 443 (1984) ], *DeCoteau,* 420 U.S. at 428, 95 S.Ct. at 1085. *Indian Country, U.S.A. v. Oklahoma Tax Comm'n,* 829 F.2d 967, 975 n. 3 (10th Cir.1987) (emphasis original).

gressional delegation of civil authority over Indian country to the tribes." 52 F.3d at 1541.

As to the argument that the Tribes have no interest in lands allotted to their members, plaintiffs provide no authority for this unique proposition, and the Court finds it wholly untenable. The Tribes' retention of trust allotments for tribal members when ceding reservation lands provided the Tribes a geographic base for exercise of their governmental authority, if that authority has not otherwise been divested. *See Washington v. Confederated Tribes of Colville,* 447 U.S. 134, 152, 100 S.Ct. 2069, 2080–81, 65 L.Ed.2d 10 (1980) ("The power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status."). Indeed, it is undisputed that the Tribes have continuously maintained their governments, notwithstanding the cession of a large part of their lands. The retained, allotted lands have never been opened to non-Indian settlement and have continuously remained in federally protected status. On these facts, the Court finds the Tribes unquestionably have taxing authority over these allotted lands.

### III.

#### *The Tribes' Taxing Power*

Plaintiffs mistakenly frame the issue as whether the Tribes can tax non-Indians on allotted lands. What the Tribes are taxing is the removal of valuable mineral resources from lands dedicated to Indian use and owned beneficially by tribal members. The tax is levied on all mineral lessees who produce oil, gas or other petroleum products from allotted lands and other lands within the Tribes' jurisdiction. Production reduces the value of what is left for the Indian trust beneficiaries. The tax falls on non-Indians because they have entered into consensual agreements, namely, leases federally approved under the Indian Mineral Leasing Act, 25 U.S.C. §§ 396a–g, and have voluntarily undertaken oil and gas development on those lands. "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1980); *see South Dakota v. Bourland,* 508 U.S. ––––––––, 113 S.Ct. 2309, 2319–20, 124 L.Ed.2d 606, 623 (1993); *Brendale v. Confederated Tribes & Bands of Yakima,* 492 U.S. 408, 428, 109 S.Ct. 2994, 3006–07, 106 L.Ed.2d 343 (1989). This well-established exception to the general rule that a tribe's power does not extend to activities of nonmembers applies here.

Indeed, the only difference between this case and *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), is that *Merrion* involved a severance tax on oil and gas produced from tribal trust lands within a reservation leased to non-Indians. While clearly the nature of the lands involved in a case may be crucial, the Court finds the Supreme Court's analysis instructive. There, the decision to uphold the tax did not hinge on the tribe's power to exclude non-Indians from the leased lands but its inherent power to govern those lands and to raise revenues to pay the costs of government. *Id.* at 137–44, 102 S.Ct. at 901–05. The Court considered whether Congress had limited tribal sovereignty by enacting legislation that deprived the tribe of its power to impose the severance tax, and found no such legislation. *Id.* at 149–52, 102 S.Ct. at 908–09.

Here, plaintiffs' argument that the Tribes have no power to tax non-Indians doing business on allotted lands disregards the Tribes' inherent power as dependent sovereigns. Plaintiffs argue that the Tribes ceded their governmental power as well as their property interest through the 1890 Cession and Allotment Agreement. However, plaintiffs' argument goes too far. The Agreement, at most, talks about the Tribes surrendering their reservation; it is silent about the Tribes' governments. The Court has found no language in the 1890 Agreement or the 1891 ratifying Act that can reasonably be read to divest the Cheyenne–Arapaho Tribes of their sovereign power to tax economic activities

within their territory. Nor do plaintiffs contend that Congress has expressed such an intention in any other federal legislation.[3]

Therefore, because the Cheyenne–Arapaho Tribes of Oklahoma are federally recognized tribes that have an inherent sovereign power to tax economic activities on their lands, and because the allotted lands are within their jurisdiction, the Tribes have the power to enact and enforce a severance tax on oil and gas production from allotted lands.

## IV.

### Constitutionality of the Tax

Even if the Tribes have the power to impose the severance tax, Ward claims that the tax scheme adopted by the Tribes violates the Interstate Commerce Clause of the United States Constitution. Ward complains that the tax (1) discriminates between non-Indian mineral lessees and Indian royalty owners and (2) unfairly requires nonmembers of the Tribes to pay for services that benefit only members. Neither contention has constitutional merit.[4]

■ First, as to the alleged unfairness of taxing only lessees and not royalty interest owners, the Commerce Clause prohibits discriminatory preference for local commerce. It "looks not to ethnicity—Indian against non-Indian—but to competitive advantage". *Kerr–McGee Corp. v. Navajo Tribe*, 731 F.2d 597, 602 (9th Cir.1984), *aff'd*, 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985). The ordinance at issue taxes all oil and gas produced from lands within the Tribes' jurisdiction at the point of severance. The ordinance makes no exception for oil and gas consumed on allotted lands or consumed by tribal members. *See Merrion*, 455 U.S. at 157–58, 102 S.Ct. at 912; *Kerr–McGee*, 731 F.2d at 602. The exemption for royalty interests merely means that "the Tribes do not have to go through the paces of taxing themselves, and that the royalty interests of individual members should remain exempt as direct income from trust lands." *Conoco, Inc. v. Shoshone & Arapahoe Tribes*, 569 F.Supp. 801, 808 (D.Wyo.1983); *see Merrion*, 455 U.S. at 158, 102 S.Ct. at 912.

■ Second, as to whether plaintiffs benefit from any tribal services, Ward's argument ignores the record. The Tribe currently provides services to all people within its jurisdiction, tribal members and non-members alike, including law enforcement protection, ambulance and emergency medical services, and a judicial system. In fact, plaintiffs have just consumed, among other things, almost five-years' worth of the Tribes' judicial resources. There is no requirement, as Ward argues, that the tax must be used to fund services related to production of oil and gas in order to be constitutional. *See Conoco*, 569 F.Supp. at 808 (citing *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981)); *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 190, 109 S.Ct. 1698, 1714–15, 104 L.Ed.2d 209 (1989).

In short, Ward's Commerce Clause challenge has no support in the undisputed facts or the law.

---

**3.** Moreover, even if a tribe's taxing power is dependent upon the tribe's power to exclude non-Indians from the lands at issue, the Cheyenne–Arapaho Tribes of Oklahoma have that power over the allotted lands. The 1865 and 1867 treaties, as amended by the 1869 executive order, established the Tribes' reservation as an area where white men would be excluded. By the Agreement, the Tribes gave up their right to exclude white men from part of that area and allowed that part to be opened to non-Indian settlement. However, the allotted lands were not opened to the public by the 1892 proclamation; they were specifically excepted. Non-Indians have continuously been excluded from ownership of the allotted lands, and those lands have continuously maintained their federally protected status.

**4.** Ward also contends in a cursory fashion that the severance tax unduly burdens oil and gas production from allotted lands. Ward presents no factual or legal support for this argument. Presumably, Ward refers to the possibility that the same activity may be subject to multiple taxation by both the Tribes and the State of Oklahoma. However, because the activity taxed occurs entirely within the Tribes' jurisdiction, "any challenge asserting that tribal and state taxes create a multiple burden on interstate commerce should be directed at the state tax, which, in the absence of congressional ratification, might be invalidated under the Commerce Clause." *Merrion*, 455 U.S. at 158 n. 26, 102 S.Ct. at 912 n. 26, *see Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 187–91, 109 S.Ct. 1698, 1713–15, 104 L.Ed.2d 209 (1989).

## CONCLUSION

Although the Court has not deferred to the Cheyenne–Arapaho Supreme Court's opinion, the result reached by the tribal courts was right. The Cheyenne–Arapaho Tribes of Oklahoma were not divested of their inherent authority to tax economic activities of non-tribal members on allotted lands by the cession of reservation lands in 1890. The allotted lands were validly set apart for use of the Tribes' members at that time and have continually been in federally protected status. Therefore, the Tribes can validly impose a tax on the valuable oil and gas development taking place on those lands as a source of revenue to fund tribal services within their territory. The Tribes should not be foreclosed from using land held in trust for tribal members to raise money to pay for governmental services. The manner in which the Tribes have imposed that tax does not implicate Interstate Commerce Clause concerns.

The Court is mindful, however, that its decision is limited to the facts of the case before it. The allotted lands at issue are trust lands. While allotted to tribal members, these lands have never been conveyed in fee simple but have continuously been held in trust by the United States. The Court leaves for another day the issue of whether different allotted lands, such as ones conveyed in fee to individual Indians with restrictions on alienation, would similarly remain within the taxing jurisdiction of the tribe to which the individuals belong.

For the above reasons, the summary judgment motions of the numerous plaintiffs in Case No. CIV–88–1801–A and plaintiff Ward Petroleum Corporation in Case No. CIV–88–1954–A are both DENIED. The defendants' motion for summary judgment in both cases is GRANTED.

It is so ordered.